**NEW ALLIANCE PARTY, Lenora B. Fulani, Alan Cox, Mary Rivera, and Arthur Rubin, Plaintiffs,**

v.

**David DINKINS, as Mayor of the City of New York, Betsy Gotbaum, as New York City Commissioner of Parks & Recreation, the New York City Department of Parks & Recreation, Lee Brown, as New York City Police Commissioner, and the New York City Police Department, Defendants.**

**No. 90 Civ. 4245 (PKL).**

United States District Court, S.D. New York.

Aug. 8, 1990.

The International People's Law Institution, New York City (Arthur R. Block, Gary Sinawski, of counsel), for plaintiffs.

Victor Kovner, Corporation Counsel of the City of New York, New York City (James A. Girillo, Thomas Roberts, of counsel), for defendants.

## ORDER & OPINION

LEISURE, District Judge:

This action is brought by the New Alliance Party ("NAP"), Lenora B. Fulani (Chairperson of NAP), and three New York City residents who allegedly attend political rallies organized by NAP. The defendants are Mayor David Dinkins (the "Mayor"), Betsy Gotbaum (New York City Commissioner for Parks & Recreation), the New York City Department of Parks & Recreation (the "Parks Department"), Lee Brown (New York City Police Commissioner), the New York City Police Department (the "Police Department"), and the City of New York (the "City"). The action requests monetary relief based on the allegedly unconstitutional denial by defendants of permission to plaintiffs to demonstrate in certain areas within sight and sound of

Gracie Mansion, the official home of the Mayor, which is located inside an enclave within Carl Schurz Park (the "Park") at 88th Street and East End Avenue in Manhattan. Plaintiffs have filed a motion for preliminary injunctive relief pursuant to Fed.R.Civ.P. 65, requesting that the Court enter a preliminary finding that defendants' actions are in violation of the first amendment to the U.S. Constitution, and that the Court order defendants to permit plaintiffs to demonstrate in the areas in question.

## FINDINGS OF FACT

### A. The Parties

Plaintiff NAP is a national political party which has promoted candidates for a variety of state and federal offices. Plaintiff Lenora B. Fulani ("Fulani") is the national and New York State Chairperson of NAP, and, under the auspices of her party, she has run for various political offices, including President of the United States, Mayor of New York City, and Governor and Lieutenant Governor of New York State. Declaration of Lenora B. Fulani, dated June 27, 1990, ("Fulani Decl."), ¶ 6. According to Fulani, NAP has lobbied consistently for economic and social policies which would chiefly benefit poor and minority communities, and has attempted to mobilize these communities into firm political opposition to the two major American political parties. Fulani Decl., ¶¶ 7–8. NAP is especially concerned with promoting the so-called "Black Agenda," a program for the economic and political advancement of the black community. Alongside Reverend Al Sharpton ("Rev. Sharpton") and the United African Movement (the "UAM"), NAP has demonstrated frequently in New York City with regard to issues of race relations, such as the well-publicized Bensonhurst murder case. Fulani Decl., ¶¶ 7, 11–12.

To support the candidacy of Mayor Dinkins, now the first black mayor of New York City, NAP collected approximately 24,500 petition signatures to assist in placing him on the ballot. While NAP mobilized voters on behalf of the Mayor, it also pursued a "Doggin' Dinkins" campaign by "attend[ing] his major campaign appearances and vocally demand[ing] that he support the Black Agenda and not forsake the particular needs of the communities from which he derived his greatest support." Fulani Decl., ¶ 9. These latter activities apparently resulted in tensions between NAP and the Mayor's campaign. Ultimately, the Mayor "intervened at the New York City Board of Elections to cause it to reject the 24,500 petition signatures NAP had gathered to help place him on the ballot." Fulani Decl., ¶ 10.[1]

Throughout 1990, NAP has endeavored to maintain political pressure on the Mayor in an effort to compel him to address its concerns. In conjunction with Rev. Sharpton and the UAM, NAP organized a rally to be held on Saturday, June 16, 1990 in Carl Schurz Park, adjacent to Gracie Mansion. The Chairperson of NAP states that "[i]t was very important to our message that we be able to communicate to the Mayor at the doorstep of his official residence. Just as Bensonhurst was the most appropriate location for our 13 marches for racial justice, Gracie Mansion was the proper situs for the June 16 rally because of the content and object of our message." Fulani Decl., ¶ 14. Specifically, plaintiffs wanted to demonstrate on the grassy oval to the immediate south of Gracie Mansion and just outside the walls of the Gracie Mansion enclave. In the alternative, plaintiffs sought to rally at the front gates of Gracie Mansion, located at 88th Street and East End Avenue.

### B. Carl Schurz Park and Gracie Mansion

Carl Schurz Park is a fifteen-acre park running from 84th Street to 90th Street,

---

1. Deputy Mayor William Lynch ("Deputy Mayor Lynch"), who managed Mayor Dinkins' campaign, testified that the signatures were rejected due to a campaign policy not to accept petition signatures unless those gathering the signatures had been granted permission in advance by the Dinkins campaign. Lynch Testimony, Tr. 31.

(References in the form "Tr." are to the transcript of the evidentiary hearing held before the Court on July 30 and 31, 1990.) The record does reflect, however, that tensions did, and still do, exist between NAP and the political supporters of the Mayor. *See infra.*

and from East End Avenue to the East River, in Manhattan. The southern half of the Park area itself is rectangular and approximately one city block in width. The Park begins to narrow at 88th Street and ends in a tapered point at 90th Street and East End Avenue. A walkway with benches and open areas, known as the Promenade, runs along the East River on the eastern edge of the Park. Local residents use the Park heavily, especially on weekends during the summer, as it is the largest area of parkland in the vicinity, Central Park being eight crosstown blocks to the west.

Gracie Mansion, the official residence of the Mayor, lies within a walled enclave in the upper portion of the Park at 88th Street. A short road runs up-hill from 88th Street and East End Avenue to the gates of the Gracie Mansion enclave, and is the only road access to the Mansion. Footpaths enter the Park at virtually every crosstown street. Directly to the south of the Gracie Mansion enclave is a small oval, sparsely planted with trees, where plaintiffs desire to hold political rallies. The oval is approximately 200 feet in diameter and grassy, except for a large area of bare ground in the center. The southeast half of the oval is flat and relatively open, while the northwest half runs slightly downhill toward the 88th Street entrance to the Park, and is more densely planted with small trees.

Doctor's Hospital occupies the entire block between 87th and 88th Streets on the west side of, and fronting on, East End Avenue. A provision of the New York City Administrative Code prohibits amplified sound within 500 feet of any hospital. *See* N.Y.C.Admin.Code, *Public Safety*, § 10–108(g). The 500–foot radius surrounding Doctor's Hospital includes the entire intersection of 88th Street and East End Avenue and most of the areas inside the Park surrounding Gracie Mansion, including the grassy oval.[2]

## C. New York City Demonstration Policy

### 1. The Parks Department Permit System

Plaintiffs contend that defendant the Parks Department maintains a "Forum Areas" policy which places portions of certain parks, and some parks in their entirety, off limits to political demonstrations. Declaration of Arthur R. Block, Esq., dated June 27, 1990 ("Block Decl."), ¶¶ 7–8, 18; Complaint, ¶ 22.[3] Plaintiffs allege that under the Forum Areas policy, there is a total ban on "political" rallies in Carl Schurz Park. Block Decl., ¶ 18; Complaint, ¶ 26. The General Counsel to the Parks Department, however, denies that this or any such policy is, or has been, in effect for the past six years. Affidavit of Sidney Nowell, Esq. ("Nowell Aff."), sworn to on July 19, 1990, ¶ 2. It is possible, although unclear based on the record, that the former Parks Commissioner maintained a Forum Areas policy. *See* Ex. A to Complaint. The Court finds that no Forum Areas policy exists, and that consideration of such a policy is not relevant to the proceedings at hand.

The current Parks Department policy requires that all groups planning an activity in a City park must apply for a Special Events Permit three weeks before the ac-

---

**2.** The state has an interest in regulating speech and protests in the vicinity of hospitals so as to minimize interference with *patient care*. However, such time, place, and manner restrictions must be set "by proper rules, with fixed standards." *Dallas Ass'n, Etc. v. Dallas City Hosp. Dist.*, 670 F.2d 629, 632 (5th Cir.), *cert. denied,* 459 U.S. 1052, 103 S.Ct. 471, 74 L.Ed.2d 619 (1982). Plaintiffs do not challenge the provision of the New York City Administrative Code prohibiting amplified sound within 500 feet of hospitals.

**3.** Arthur R. Block, Esq. is counsel for plaintiffs, and indicated during his questioning of witnesses at the evidentiary hearing that he was present at certain meetings and at the demonstrations which are the subject of these proceedings. However, he was careful *not* to pit his credibility against that of the witnesses during his questioning or his summation, thus avoiding what might have been a problem for the Court as a trier of fact. *See United States v. Dennis,* 843 F.2d 652, 656 (2d Cir.1988). Nor did defendants seek to call attorney Block as a witness or otherwise move to disqualify him as trial counsel. *Compare Acme Analgesics, Ltd. v. Lemmon Co.,* 602 F.Supp. 306 (S.D.N.Y.1985) *with Bottaro v. Hatton Associates,* 680 F.2d 895 (2d Cir. 1982) *and Lamborn v. Dittmer,* 873 F.2d 522, 530–32 (2d Cir.1989).

tivity date. Nowell Aff., ¶ 3. Counsel for defendants states that "the terms under which these permits are issued are always subject to change based on the conditions prevailing within the area at any given time." Defendants' Memorandum of Law, at 7. Although the Parks Department possesses the formal authority to grant or deny Special Events Permits, any City agency may raise concerns about the impact of the proposed activity on its operations. *Id.* The Police Department is one such City agency which may consult with the Parks Department in determining whether a Special Events Permit should be granted.

The Court finds that there are no explicit guidelines used by the Parks Department to decide whether to grant or to deny Special Events Permits. Unlike many municipal permit forms, the face of the Special Events Permit form does not indicate any statute or regulation setting forth such guidelines or providing for the permit system itself. *See* Ex. 5 to Nowell Aff. The record indicates that the Parks Department possesses full discretion in deciding whether to grant or to deny Special Events Permits. The testimony of Police Department officials suggests that while the Police Department may be able to influence the decision, final authority rests with the Parks Department. Martin Testimony, Tr. 61–62, 85–87; Maldonado Testimony, Tr. 123–28, 137–38.[4]

2. Police Department Regulations and Practices

The New York City Police Department is the City agency most actively opposed to plaintiffs' demand to protest in the immediate vicinity of Gracie Mansion. After an unruly demonstration by the Patrolmen's Benevolent Association of the City of New York (the "PBA") over contract disputes in 1976, the City brought suit in New York State Supreme Court seeking an injunction restricting the ability of the PBA to demonstrate in the Gracie Mansion area. The PBA rally had taken place at 89th Street and East End Avenue and became disorderly, with demonstrators climbing over the wall into the Park at 89th Street. Lavin Testimony, Tr. 217–18.[5] By order dated September 30, 1976, Justice Edward J. Greenfield granted the City's motion for an injunction, and ruled that no more than 100 PBA members could rally in the area bounded by 90th Street to the north, 86th Street to the south, York Avenue to the west, and the East River to the east, and that the Police Department would have full discretion in deciding where the rally could take place. *See The City of New York v. Patrolmen's Benevolent Association of the City of New York, Inc.,* Index No. 42018/76, Order dated Sept. 30, 1976.[6]

After the PBA protests had terminated, the Police Department issued an order declaring that all rallies aimed at Gracie Mansion must take place on the east side of East End Avenue at 89th Street. Lavin Testimony, Tr. 217–18. However, according to the testimony of several Police Department officials, no group or individual has specifically requested to conduct a political rally on the grassy oval, immediately south of the Gracie Mansion enclave, in recent years. Martin Testimony, Tr. 65–67; Maldonado Testimony, Tr. 126–27; Lavin Testimony, Tr. 222. In addition, there was

---

4. Captain Jules A. Martin ("Captain Martin" or "Martin") is "the commanding officer of the Municipal Security section of the Intelligence Division of the New York City Police Department ... responsible for the safety and security of the Mayor, the City Council President, the Comptroller and the Governor whenever he is within New York City." Martin Testimony, Tr. 55. Sergeant Milton M. Maldonado ("Sergeant Maldonado" or "Maldonado") is "community liaison person for the 19th precinct with regard to demonstrations and rallies within the precinct [which includes Gracie Mansion and Carl Schurz Park]." Defendants' Memorandum of Law, at 4.

5. Inspector Brian F. Lavin ("Inspector Lavin" or "Lavin") is the Commanding Officer of the Fourth Division of the Police Department which includes the 19th Precinct, and is a 28–year veteran of the Police Department. Affidavit of Brian F. Lavin, sworn to on July 19, 1990 ("Lavin Aff."), ¶ 1.

6. During Inspector Lavin's testimony at the hearing, a copy of Justice Greenfield's order was produced by defendants' counsel, and marked as Court Exhibit 1.

confusion over whether there was an explicit Police Department or City policy preventing protestors from using the oval, or whether there had been no demonstrations at that location simply because no group had requested to rally there.[7] In addition, the Court has not been made aware of the precise text, if any, of the Police Department order regarding demonstrations in the Gracie Mansion area, as a result of the evidentiary hearing and the papers submitted by the parties. Accordingly, the Court must find on the present record that there is no Police Department policy specifically regarding use of the oval for political rallies which predates the events at issue in this litigation.

Plaintiffs allege, upon information and belief, that it was the policy of the Police department up until June 16, 1990 to permit rallies at 88th Street and East End Avenue, outside of the Park, but within sight and sound of Gracie Mansion. Complaint, ¶ 31. This allegation was strongly disputed by a knowledgeable Police Department official, Inspector Lavin. Lavin Testimony, Tr. 219–20. Indeed, the testimony of all three Police Department officials at the hearing expressed concern over preserving road access to Gracie Mansion by means of 88th Street and East End Avenue. It necessarily follows, as a finding of the Court, that there is no evidence on the current record that a rally or mass meeting of any type has ever taken place at 88th Street and East End Avenue, or that the Police Department permitted, or maintained a policy of permitting, such rallies.

### D. The Demonstrations

#### 1. Planning the June 16 Demonstration

■ On June 1, 1990, plaintiffs filed an application for a Special Events Permit to demonstrate on June 16 inside the Gracie Mansion enclave, or inside the Park as close as possible to the enclave. Complaint, ¶¶ 33–34. This application was denied by the Parks Department on June 5. Plaintiffs' counsel contends that he was informed by two Parks Department officials that the Special Events Permit application was denied due to the Forum Areas policy, which acted as a complete ban on political rallies inside Carl Schurz Park. Block Decl., ¶¶ 7–8. Plaintiffs' counsel thereafter informed the Parks Department that he believed the Forum Areas policy to be violative of the first amendment. Complaint, ¶ 36.

On June 8, NAP's counsel met with Sergeant Milton Maldonado of the 19th Precinct and toured the area in question. Sergeant Maldonado informed plaintiffs' counsel that the Police Department would issue a permit for amplified sound for the area between 85th and 86th Streets and East End Avenue and would secure the rally site in that area. In addition, Sergeant Maldonado stated that if the Parks Department issued a Special Events Permit for inside the Park, the Police Department would secure the rally there, although it would be opposed to the rally site. Maldonado Testimony, Tr. 125; Declaration of Gail Elberg, dated June 27, 1990 ("Elberg Decl."), ¶ 9.[8] Subsequently, the Parks Department reversed its position and agreed to issue a Special Events Permit for the rally to take place on the oval inside the Park immediately to the south of the Gracie Mansion enclave. Block Decl., ¶¶ 10–11; Complaint, ¶¶ 41–42.

When plaintiffs' counsel received the Special Events Permit on June 15, 1990,

---

**7.** Captain Martin stated that he was aware of no written policy regarding mass assemblages on the oval, but that "there is no demonstration allowed inside of the Park," regardless of the number of individuals involved. Martin Testimony, Tr. 64–67. Sergeant Maldonado stated that he was unaware of any written policy regarding the oval. Maldonado Testimony, Tr. 126–27. When asked on June 8 by plaintiffs whether they could demonstrate in the oval, Maldonado said that if the Parks Department issued the Special Events Permit, the Police Department, while it would oppose the rally location, would police it. Maldonado Testimony, Tr. 125–26. Inspector Lavin stated that the Police Department had designated 89th Street and East End Avenue for all protests in the vicinity of Gracie Mansion, and that "he would not permit" a rally on the oval. Lavin Testimony, Tr. 217–18, 222.

**8.** Gail Elberg is the New York City Coordinator of NAP, and was present at the three demonstrations at issue in this litigation.

however, he noticed that the area for the rally was described as the "Promenade at 86th Street," approximately two blocks to the south of Gracie Mansion. Block Decl., ¶ 11. Counsel called the Parks Department and was told that the Police Department had reversed its position and refused to allow the rally to proceed north of 86th Street inside the Park. Block Decl., ¶ 12. According to plaintiffs' counsel, the Police Department subsequently told him that the office of the Mayor had instructed them not to allow the rally to proceed inside the Park up to Gracie Mansion. Block Decl., ¶ 13. Plaintiffs allege that this action taken by the office of the Mayor "was motivated by [the Mayor's] opposition to the political activities of the persons organizing the rally and the content of the political speech that would be engaged in at the rally." Complaint, ¶ 79.

At a hearing held before the Court on July 30 and 31, 1990, plaintiffs' counsel examined several members of the staff of Mayor Dinkins in an attempt to uncover evidence of a content-based restriction of plaintiffs' speech. Although plaintiffs were handicapped by a lack of pre-hearing discovery due to their interest of proceeding promptly with the hearing, the Court must find that on the present record there is no evidence of the office of the Mayor, or any other City official, taking part in content-based restriction of plaintiffs' speech. Deputy Mayor Lynch testified that while there were indeed "philosophical differences" and "disagreement in approach" between the Mayor and the New Alliance Party, the office of the Mayor had no affirmative policy to disassociate itself from the activities of plaintiffs. Lynch Testimony, Tr. 23, 37–39. Deputy Mayor Lynch candidly stated that he did not view plaintiffs as ever having been associated with Mayor Dinkins or the Democratic Party. Lynch Testimony, Tr. 37–38. More importantly, Deputy Mayor Lynch stated that his only concerns with plaintiffs' planned demonstrations were focused on security rather than on politics. Lynch Testimony, Tr. 26, 37.

Marcia Smith ("Smith" or "Ms. Smith"), Chief of Staff of Deputy Mayor Lynch, testified that she had been contacted by Captain Martin and briefed on his security concerns and plans for the rally. Smith Testimony, Tr. 44–47. According to Ms. Smith, Captain Martin identified the protestors as being members of NAP, but did not mention the attendance of Rev. Sharpton. Smith Testimony, Tr. 52. Captain Martin asked Ms. Smith whether she thought the Deputy Mayor would object to his proposed plan to prevent plaintiffs from demonstrating in the immediate vicinity of Gracie Mansion, and indicated that he would proceed with implementation of the plan unless he heard differently from her. Smith Testimony, Tr. 47. Ms. Smith then testified that she spoke with the Deputy Mayor, and that he did not appear to know anything about the planned rally. Ms. Smith described Captain Martin's plan to the Deputy Mayor who apparently had no objections. The briefing took less than one minute. Smith Testimony, Tr. 49–52.

Captain Martin testified that he had immediate security concerns when he first learned that the Parks Department had granted, or was about to grant, plaintiffs a permit to demonstrate inside Carl Schürz Park. Martin Testimony, Tr. 60–63. While he was aware of the identity of the protestors, including Rev. Sharpton (Martin Testimony, Tr. 59–60), he had no evidence that plaintiffs would attempt to breach police lines. Rather, his concerns were general operational concerns of having demonstrators inside the Park in the proximity of Gracie Mansion. Martin Testimony, Tr. 78–79. Captain Martin testified that he spoke to Mayor Dinkins about the rally, briefed the Mayor on his plan to contain the rally, and that the Mayor did not say anything in response. Martin Testimony, Tr. 90–97. Based on this and the testimony of other witnesses, the Court finds that there is no evidence that the restrictions imposed on plaintiffs' rallies were due to the content of plaintiffs' speech.

### 2. The June 16 Demonstration

On the morning of June 16, 1990, the day of the demonstration, the Police Department erected barricades running along

East End Avenue from 86th to 88th Streets. Several hours later, however, just prior to the beginning of the rally, the Police Department erected barricades across East End Avenue at 86th Street. Elberg Decl., ¶ 12; Complaint, ¶¶ 50–51. The Police Department informed plaintiffs that a group called "New Yorkers for Dinkins" was planning a counterdemonstration at 89th Street and East End Avenue. Elberg Decl., ¶¶ 13–14. Plaintiffs allege that the Police Department changed the area of the demonstration on the morning of June 16 due to directions from the office of the Mayor. Complaint, ¶ 52. The Court finds that there is no evidence of this latter allegation.

The rally on June 16 took place without significant incident. The Police Department blocked off traffic on East End Avenue in the immediate area, and plaintiffs operated their sound truck from 86th Street and East End Avenue. When no counterdemonstration developed, plaintiffs requested that they be allowed to proceed north on East End Avenue to within sight and sound of Gracie Mansion. The Police Department denied this request, and, it appears, increased security along the barricades at 86th Street and East End Avenue.[9] The rally continued without further incident.

### 3. The June 30 Demonstration

Plaintiffs again requested permission to conduct a second demonstration on Saturday, June 30, 1990, inside the Park at 88th Street next to the Gracie Mansion enclave. Plaintiffs' requests were denied. In addition, the Police Department refused to permit plaintiffs to proceed north of 86th Street on East End Avenue in order to come within sight of Gracie Mansion. Plaintiffs requested that the Court issue a temporary restraining order allowing them to rally in all or any of these areas.

At a hearing held on June 29, the Court urged the parties to attempt to work out a mutually acceptable agreement for the rally planned for the next day. After considerable negotiation, defendants agreed to allow plaintiffs to commence their rally at 86th Street both inside the Park and on East End Avenue. The demonstrators would then march one block west on 86th Street to York Avenue, north on York Avenue to 90th Street, east on 90th Street to East End Avenue, and south on East End Avenue to 89th Street (the "York Avenue route"). The rally could then take place within sight and sound of Gracie Mansion, without interfering with the road entrance to the Park and to Gracie Mansion at 88th Street and East End Avenue.

The June 30 demonstration proceeded as planned. The protesters gathered at 86th Street and remained there for several hours using the sound truck to project their message north towards Gracie Mansion. Subsequently, they proceeded along the York Avenue route, walking four or five persons abreast along the sidewalk and chanting. After rallying at 89th Street and East End Avenue, the demonstration dispersed without incident. The Police Department claimed that it received a substantial number of complaints from residents along the York Avenue route who were disturbed by the chanting and who were unable to gain access easily to and from their homes and stores at that time.[10]

### 4. The July 14 Demonstration

Plaintiffs again planned to demonstrate on July 14 in the vicinity of Gracie Mansion. Plaintiffs represented to the Court that the Police Department would not permit them to march along the York Avenue route due to disturbances caused to local residents, and that they therefore wished to move again for a temporary restraining

---

**9.** Inspector Lavin testified that at one point in the rally, a speaker urged the demonstrators to proceed up East End Avenue in the direction of Gracie Mansion, and that the protestors simultaneously turned to face the police barricades. Although a protestor reportedly shouted "We're not going to take this anymore," and the group was continually chanting "No justice, no peace,"

there is no evidence that the protestors attempted to breach the police barricades. *See infra.*

**10.** The Court received telephone and written communications from the presidents of two cooperative building corporations in the area expressing concerns to the same effect.

order. After consultation with the Court, defendants agreed that plaintiffs would be permitted to use the York Avenue route, in a similar fashion as they did on June 30, 1990. The July 14 demonstration apparently took place without significant incident.

## CONCLUSIONS OF LAW

■ In *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir.1989), the Second Circuit set out the standard for the issuance of a preliminary injunction. The Court stated:

A preliminary injunction will not issue unless the movant demonstrates both irreparable harm and a likelihood of success going to the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor.

*Id.* at 972 (*citing Fireman's Fund Ins. Co. v. Leslie & Elliott Co., Inc.*, 867 F.2d 150, 150 (2d Cir.1989) (per curiam)). More specifically, the movant must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." *Id.* at 975 (*quoting Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155 (E.D.N.Y. 1986)); *accord Kaplan v. Board of Education of the City of New York School District*, 759 F.2d 256, 259 (2d Cir.1985). "The injury must be one requiring a remedy of more than mere money damages." *Tucker Anthony, supra*, 888 F.2d at 975; *see also Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir.1989), *cert. denied sub nom. Huntington v. Stone,* — U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### A. Irreparable Harm

■ Although the Supreme Court has stated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), the Third Circuit has held that such irreparable harm does not automatically entitle the plaintiff to equitable relief; rather, the plaintiff "must show 'a chilling effect on

free expression.'" *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir.1989) (*quoting Dombrowski v. Pfister*, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)). For equitable relief, a court must find direct and purposeful government interference with speech, not solely incidental interference. *Hohe v. Casey, supra*, 868 F.2d at 73.

■ The Court believes that plaintiffs have demonstrated irreparable harm in the circumstances of the case. It is clear from the record that plaintiffs' speech has been directly interfered with by defendants, and that this interference may create a chilling effect on plaintiffs' future plans to conduct rallies. The effects of political demonstrations, in terms of mobilizing coalitions and maintaining pressure on elected officials, is inherently unpredictable and unquantifiable. It is crucial that a presumption should exist allowing all political groups to press their demands at times and in contexts and locations of their own choosing. As the harm cause by the restriction of political speech is inherently unravelable, the Court hereby rules that plaintiffs have demonstrated irreparable harm as required by the caselaw interpreting Fed.R.Civ.P. 65.

### B. Likelihood of Success on the Merits

■ "The Supreme Court has repeatedly held that 'government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information."'" *Carew-Reid v. MTA*, 903 F.2d 914 (2d Cir. 1990) (*quoting Ward v. Rock Against Racism*, — U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (*quoting Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984))).

"Assuming that a regulation is content-neutral, the reasonableness of the regulation will often depend upon '[t]he nature of

a place [and] "the pattern of its normal activities." ' " *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1363 (2d Cir.1989) (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (*quoting* Wright, *The Constitution on the Campus*, 22 Vand.L.Rev. 1027, 1042 (1969))). Parks and sidewalks are generally recognized as public forums where, throughout our history, citizens have been granted the right to speak freely on social and political issues.[11]

### 1. Inside Carl Schurz Park

#### a. The Parks Department Special Events Permit System

In his closing statement before the Court, defendants' counsel stated that "[t]he reason that [plaintiffs] were not permitted in the oval was not because of [the Parks Department], but because of the testimony that has been given here. It is very clear[ly] because of police security. Whether [the Parks Department] has an overbroad policy or not, which they've now backed away from, in no way should influence the Court's ruling on the preliminary injunction, because it was not the basis for the action taken." Tr. 276–77. While the Court concurs with defendants' counsel that the actions of the Parks Department are not central to resolution of the pending motion, the Court feels duty bound to comment on the current Parks Department Special Events Permit system.

The Supreme Court has recently written of "the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). The Supreme Court continued to say that

> the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Id.* 108 S.Ct. at 2144 (*citing Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 964 n. 12, 104 S.Ct. 2839, 2850, n. 12, 81 L.Ed.2d 786 (1984) and *Cox v. Louisiana*, 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965)).

In light of this caselaw, the Court does not see how the Parks Department's Special Events Permit system sufficiently protects against content-based restrictions of speech. As the Court understands the current Parks Department permitting system, the applicant fills out a form denoting the time, place, and type of activity, and then submits the form to the Parks Department. Without any regulatory guidelines, the Parks Department decides whether to grant or to deny the permit. Such a procedure seriously threatens the first amendment rights of the citizenry, and should not

**11.** The traditional articulation of the public forum doctrine, as set out by Justice Roberts, states that public streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939). *See also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *New York State National Organization for Women, supra*, 886 F.2d at 1336.

be permitted to be used as a justification for the prevention of any speech or conduct protected by the first amendment.

While the Court recognizes that the Parks Department has a great interest in regulating activities within the City's parks, these interests should be made explicit and fashioned into guidelines which may be applied to each incoming application. However, as the Police Department appears to be the principal party opposing plaintiffs' demands and taking concrete action to block those demands, the Court makes no formal ruling on the constitutionality of the Parks Department's Special Events Permit system, either in the abstract or as applied in this case.

**b. Police Department Regulations and Practices**

It is uncontroverted that the Police Department is obligated to preserve the public peace and security, and maintains the power to disperse and to regulate public assemblages when these interests are threatened. *See Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 474–75 (2d Cir. 1980) (*citing* § 435 of the contemporaneous New York City Charter). However, these obligations must be carried out in light of the first amendment interests of the public. *Id.* at 474 ("The question then comes down to one of balancing the interests involved.").

Police officials are often compelled to set guidelines on short notice with regard to mass assemblages and political demonstrations, as these events may arise and develop spontaneously in a wide variety of locations and circumstances. This situation is unavoidable given the day-to-day exigencies of police business. Although there is a heightened chance of content-based restriction of speech taking place under these circumstances, this Court does not believe that the warnings of the Supreme Court in *City of Lakewood, supra*, 108 S.Ct. at 2143–44, should apply with equal vigor, due to the impossibility of a pre-set permitting system with explicit guidelines. Thus, the regulatory actions of the police should ordinarily be subject to the same legal analysis as pre-set guidelines, absent evidence of content-based restriction. *See generally Olivieri v. Ward*, 801 F.2d 602, 605 (2d Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (applying the standard three-part test of the Supreme Court in ruling on the constitutionality of Police Department actions in regulating protests by Catholic homosexuals and counterdemonstrators in front of St. Patrick's Cathedral); *Concerned Jewish Youth, supra*, 621 F.2d at 474–77.

The need to ensure the physical safety of the Mayor of New York and his family at Gracie Mansion constitutes a significant and compelling government interest. As articulated by the District of Columbia Circuit Court with regard to the security of the White House, "[a]t stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion...." *White House Vigil v. Clark*, 746 F.2d 1518, 1528–29 (D.C.Cir. 1984). The key inquiry for the Court is whether the actions of the Police Department are narrowly tailored to address this government interest, or whether they unjustifiably curtail the first amendment rights of plaintiffs.

**1. The Oval**

Both through affidavit and live testimony, Police Department officials have articulated their security concerns with regard to plaintiffs' planned protests on the oval. In brief, these concerns are summarized as follows: (1) The area would be very difficult to police, because the ground is uneven and there are trees; (2) The walls of the compound are approximately seven feet high and could be easily scaled by the demonstrators; (3) The windows of Gracie Mansion are literally a "stone's throw" away from the area; (4) The demonstrators could spill over into the roadway entrance at 88th Street and East End Avenue, thus blocking vehicular access to Gracie Mansion. *See* Lavin Aff., ¶¶ 4–5; Lavin Testimony, Tr. 221–23, 230–31, 259–69; Maldonado Testimony, Tr. 138–43, 172–73; Martin Testimony, Tr. 76–77, 106–12.

Plaintiffs' counsel closely examined Inspector Lavin in the ability of the Police Department to control a rally on the oval. Inspector Lavin agreed that he could erect police barricades reinforced by police officers on foot and on horseback in the oval, but firmly stated that such defensive configurations would not "insure the security" of Gracie Mansion. Lavin Testimony, Tr. 259. Later, Lavin stated that it was "physically impossible" and "terribly imprudent" to try to arrange a proper network of barricades on the oval, with the normal complement and proper spacing of officers on foot, officers on horseback, and police vehicles behind the barricades. Lavin Testimony, Tr. 262–63. Sergeant Maldonado testified that such a configuration would situate the police with "their backs against the wall," and that the mobilization of police reinforcements behind the barricades would be nearly impossible. Maldonado Testimony, Tr. 172.

Inspector Lavin testified in more general terms concerning the unpredictable and volatile nature of crowds, and the need for the police to maintain as large a margin for error as possible. Lavin Testimony, Tr. 222–23, 229–30.[12] More specifically with regard to plaintiffs' conduct, Lavin testified that on one occasion he had increased police presence along the barricades at 86th Street due to fears that the rally might become disorderly.[13] Sergeant Maldonado, however, testified that he "had no problems whatsoever" with the crowd or communicating with its leaders during the demonstrations. Maldonado Testimony, Tr. 145, 189.

■ The Court is sensitive to the security concerns of the Police Department, especially with regard to the volatile nature of crowds, and the difficulty of controlling crowds, in small areas of uneven parkland. However, these security concerns must be balanced against the first amendment interests of plaintiffs, as enunciated by the Supreme Court decisions previously cited. These decisions, in effect, create a presumption that plaintiffs should be able to conduct political rallies in the streets and parklands of this City. As will be discussed below, the Court believes that a compromise can be fashioned by granting plaintiffs a limited right of access to the oval for purposes of conducting political rallies, and simultaneously permitting the Police Department to take steps to fulfill its important duties and responsibilities of protecting the Gracie Mansion enclave and its occupants.

It is clearly more advantageous for plaintiffs, and therefore more fully satisfies their first amendment interests, to conduct political rallies on the oval rather than either south of 86th Street or at 89th Street and East End Avenue. The 86th Street location is completely out of sight of Gracie Mansion, being over two blocks to the south of the Mansion. The 89th Street location, while being quite close to the Mansion, is at a substantially lower elevation and behind both the Park wall and the wall into the enclave, permitting only a glimpse of the northern corner of the Mansion. Because of their distance from Gracie Mansion, it is the Court's conclusion that these locations do not provide plaintiffs "ample alternative channels for communication of the information." Ward v. Rock Against Racism, supra, 109 S.Ct. at 2753. The oval, on the other hand, is on eye-level with the Mansion, and allows plaintiffs to direct their speech into the

---

**12.** By way of example from an experienced eye how quickly a crowd can turn ugly, Lavin testified as follows: "When a demonstration gets disorderly, it gets disorderly very, very quickly and things happen very, very quickly...." *Id.* Tr. 222.

**13.** When asked by defendants' counsel why he had increased police presence along the barricades, Lavin replied that his decision was due to "[a]lot of statements made from the platform and the crowd; they were going up East End Avenue, fired up and ain't going to take no

more. Someone saying 'ain't going to take no more,' means something is going to happen, 'no justice, no peace.' Every one of the speakers said they didn't see any justice. No more peace indicates beginning to be less than peaceful.... At one point the crowd was pointing at us, up almost to East End Avenue. Almost everyone in the crowd turned and faced northbound, which suggested to me that they might be thinking of coming up the street." Lavin Testimony, Tr. 227–28.

enclave. The Court views the advantage presented by the oval as a rally site as a cognizable first amendment interest.

The Court accepts the testimony of the Police Department officials that a rally on the oval would be more difficult to secure than a rally south of 86th Street or at 89th Street. Although the increased security risks are outweighed by plaintiffs' first amendment interests in conducting a rally on the oval within sight and sound of Gracie Mansion, the Court recognizes that there are security risks involved in any mass assemblage of citizens, whether the intent of the people is peaceful or becomes hostile.

Accordingly, the Court believes that an unrestricted rally in the oval would be unacceptable given the small size of the Park, the topography, and the proximity of Gracie Mansion. Therefore, as the provisions of the Court's order set out below indicate, the Court has taken steps to minimize the attendant security risks. These guidelines should allow the Police Department to keep plaintiffs a substantial distance away from the walls of the Gracie Mansion enclave, to move reinforcements in behind the barricades if needed, to keep clear the road access to Gracie Mansion at 88th Street and East End Avenue, and to contain plaintiffs on relatively open and flat ground where crowd control is facilitated. For these reasons, the current position of the Police Department is not "narrowly tailored to serve a significant government interest." *Ward v. Rock Against Racism, supra*, 109 S.Ct. at 2753.

The Court believes that it possesses the remedial power to set out guidelines for future demonstrations due to the unreasonableness of the current positions of both parties. The Second Circuit, in contrast to the District of Columbia Court of Appeals, has ruled that it is appropriate for federal courts to set forth detailed procedures in balancing the interests involved. *See Olivieri v. Ward, supra*, 801 F.2d at 605–06.[14] Otherwise, the Court is faced with the option of either sanctioning government conduct which it believes to be unconstitutional, or permitting conduct by plaintiffs which may threaten the public safety. Given the public importance of these issues, the Court finds this choice to be unacceptable. With these considerations in mind, the Court concludes that the Police Department should be permitted to take the steps set out below, in limiting the time, place, manner, and duration of the rally, and that such limitations are appropriate and not violative of plaintiffs' constitutional rights, under the circumstances of this case.

### 2. 88th Street and East End Avenue

Defendants have articulated compelling reasons why this area should be kept clear: it provides the only vehicular access to Gracie Mansion, which is essential in case there is a need for quick ingress or egress under exigent circumstances by the Mayor, his staff, or his family. Lavin Aff., ¶¶ 2–3. The Police Department states that it is the normal policy to keep this area clear at all times. Lavin Aff., ¶ 2. During the hearing, plaintiffs seemed to mollify their demand to hold rallies at 88th Street and East End Avenue in front of the gates of the Mansion. In any event, the Court rules that the Police Department may take all necessary steps to keep this area clear and open without infringement on the first amendment rights of plaintiffs.

---

**14.** In *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299, 104 S.Ct. 3065, 3072, 82 L.Ed.2d 221 (1984), the Supreme Court reversed the United States Circuit Court of Appeals for the District of Columbia and noted that the Circuit Court's suggestion to reduce the size and duration of the proposed demonstration were inappropriate given the judiciary's lack of expertise in fine-tuning government regulations regarding mass assemblages. The Second Circuit has explicitly disagreed with the proposition that courts are unable to fashion such detailed orders: "A court's power to review government restrictions imposed on the exercise of a First Amendment right occupies middle ground between [the] extremes [of agency policymaking and constitutional interpretation]. It does not kowtow without question to agency expertise, nor does it dispense justice according to notions of individual expediency 'like a kadi under a tree.'" *Olivieri v. Ward, supra*, 801 F.2d at 606 (*quoting Terminiello v. Chicago*, 337 U.S. 1, 11, 69 S.Ct. 894, 899, 93 L.Ed. 1131 (1949) (Frankfurter, J., dissenting)).

CONCLUSION

IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65 is granted in part and denied in part. Plaintiffs may conduct a rally on the grassy oval inside Carl Schurz Park just to the south of the Gracie Mansion enclave under the circumstances set out below. The Police Department may impose the following conditions on plaintiffs' demonstrations without infringement of plaintiffs' first amendment rights:

(1) No more than one hundred (100) persons may be present for the purposes of conducting a demonstration on the oval at any time;

(2) The duration of any demonstration on the oval may be limited to two hours;

(3) The Police Department may erect barricades approximately bisecting the oval on its northeast-southwest axis, and may contain plaintiffs in the flat, open southeast half of the oval, and may prevent plaintiffs from occupying the northwest half of the oval;

(4) The Police Department may take all necessary steps to keep the road entrance to Gracie Mansion located at 88th Street and East End Avenue clear to vehicular access at all times;

(5) The Police Department may contain the main portion of the demonstration south of 86th Street inside Carl Schurz Park and on East End Avenue, and may disallow plaintiffs from entering any other part of the Park, and may permit, at an agreed upon time in the demonstration, a group of one hundred (100) or fewer demonstrators to march from the contained area south of 86th Street to the oval, either by marching up East End Avenue and entering the Park at the 87th Street entrance, or by marching up through the interior of the Park;

(6) The Police Department may refuse to permit the group of one hundred (100) or fewer demonstrators from leaving the contained area south of 86th Street and marching to the oval if the demonstration has become threatening to the safety of the

public, or if it appears likely that the demonstrators will violate any of the conditions of this order;

(7) The Police Department may terminate the demonstration on the oval if at any time the demonstration has become threatening to the safety of the public, or to the security of the Mayor and Gracie Mansion, or to the effective functioning of the office of the Mayor;

(8) This order is subject to modification, extension, and revocation by this Court upon motion of the parties based on future developments.

SO ORDERED.