888 F.2d 969
 TUCKER ANTHONY REALTY CORPORATION, Charles F. Hovey, Jr.,
Laura J. Vennard, Stephen Palmer, R. Park Palmer, John C.
Dusel, George Crawford and Tucker Anthony & R.L. Day,
Incorporation, Plaintiffs-Appellees,
v.
Richard SCHLESINGER, Adson Partners, a limited partnership,
and Adson Realty Associates, a limited
partnership, Defendants-Appellants.
 Docket No. 1138, 89-7181.
 United States Court of Appeals,
Second Circuit.
 Argued May 12, 1989.
Decided Nov. 6, 1989.
 
 Peter S. Herman, New York City (Richard Sussman, New York City, of counsel), for defendants-appellants.
 Michael S. Gruen, New York City (David R. Gilliatt, Gruen, Gilliatt & Livingston, New York City of counsel), for plaintiffs-appellees.
 Before KEARSE, CARDAMONE and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Plaintiffs, individuals and corporations, participate as limited partners in two limited partnerships: defendant Adson Realty Associates (Associates) and defendant Adson Partners (Adson). Defendant Richard Schlesinger is the sole general partner of Adson. Believing the general partner was too enterprising a steward, plaintiffs obtained a preliminary injunction on January 27, 1989 in the United States District Court for the Eastern District of New York (Sifton, J.). The preliminary injunction enjoined defendants "from making payments, directly or indirectly, to or for the benefit of defendant Schlesinger [the general partner] and entities in which [he] has an interest, without leave of the Court."
 
 
 2
 This appeal presents three principal issues: (1) whether the district court applied the correct fiduciary standard to Schlesinger's conduct as a general partner in two limited partnerships; (2) whether there is sufficient evidence that the plaintiff limited partners consented to the self-interested transactions by the general partner to make it unlikely their claim will succeed on the merits; and (3) whether the plaintiffs established irreparable harm requisite to the issuance of a preliminary injunction in their favor.
 
 
 3
 * A brief recitation of the background facts is necessary. Associates was formed in March 1980 to finance the purchase and conversion into cooperatives of a garden apartment complex in Hartsdale, New York. Under the financing agreements, Associates acquired an option to purchase the complex from the actual purchaser, Dalewood Associates. Prior to the conversion of the complex, Associates transferred the option to Adson in exchange for a $5 million promissory note. Today, Associates is largely dormant and the note is its sole asset.
 
 
 4
 Adson exercised the option, took title to the complex, and conveyed it to the Cooperative Corporation at the completion of the conversion in November 1984. Adson retained ownership of approximately 275 unsold apartments, having a book value of ten and a half million dollars.
 
 
 5
 Defendant Schlesinger, as the general partner of Adson, had the duty of renovating, maintaining, selling, and collecting rent on the units. In carrying out his duties, he engaged in extensive self-dealing, hiring companies he owned or controlled to manage, renovate, and sell the apartments. He also lent money to Adson with interest fixed several points above the prime rate. Presumably this money has been used to pay off Schlesinger-owned companies for the actual work they performed resulting in a double profit to him: first, on the work performed by his alter-ego companies, and second, on the above-prime-rate loans. In addition, Schlesinger has used in excess of $50,000 of Adson's funds to defend himself in this action.
 
 
 6
 Plaintiffs allege that the general partner breached his fiduciary duty of loyalty to the limited partners and the partnership by engaging in such self-dealing. Schlesinger admits engaging in the self-interested transactions, but claims that this did not constitute a breach of his fiduciary duty to the limited partners because the companies he employed were hired in good faith and on commercially reasonable terms.
 
 
 7
 Adson's financial situation is precarious. Although the book value of the complex is several million dollars, the remaining units cannot be sold and turned into cash until they are vacated by existing tenants. There has been little turnover in occupancy with a consequent low rate of vacancies. Further, Adson owes Chemical Bank $1,370,000 on a loan due on May 30, 1993 that contains an acceleration of principal clause activated upon, among other events, the declaration that Adson is insolvent. Adson also owes Mark David Associates, a general partnership in which Schlesinger and William Weinstein each own a one-half interest, $500,000 due on demand. It is further obligated to Schlesinger and Weinstein individually on a demand loan for $375,000. They loaned Adson this money out of a $500,000 loan they received from Citytrust. Their obligation to Citytrust is also due on demand. Thus, Adson is effectively insolvent with current liabilities $42,000 greater than current assets, excluding all the monies due and owed to Schlesinger and to Chemical Bank that are technically not current liabilities.
 
 
 8
 Plaintiffs sought damages, injunctive relief and judicial dissolution of the two Adson partnerships, and moved for a preliminary injunction and for the appointment of a receiver. In an opinion and order dated January 27, 1989 Judge Sifton issued the preliminary injunction. Plaintiffs' showing of the partnerships' danger of bankruptcy--caused, at least in part, by Schlesinger's self-dealing--had adequately demonstrated to the district court the required irreparable harm. The district judge also determined that plaintiffs would probably succeed on the merits of their claim that Schlesinger breached his fiduciary duty to the limited partners. Specifically, the district court held that a general partner of a limited partnership owes a duty of loyalty akin to a trustee's duty to beneficiaries, and believed that duty was higher than the duty owed by a corporate director to shareholders. Based upon this standard, it held that a general partner is prohibited from self-dealing, including doing business with companies he controls or owns, unless the partnership agreement permits it or the limited partners otherwise ratify the transactions. Because Schlesinger sought only to prove the self-interested transactions were fairly taken in good faith, and proved neither an agreement nor authorization, the plaintiffs were granted preliminary injunctive relief.
 
 
 9
 Although we do not adopt the duty of loyalty standard relied upon by the district court, we find that the district court's issuance of a preliminary injunction under the proper standard would not have been an abuse of discretion. Hence, we affirm.
 
 II
 
 10
 A preliminary injunction will not issue unless the movant demonstrates both irreparable harm and a likelihood of success on the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor. Fireman's Fund Ins. Co. v. Leslie & Elliott Co., Inc., 867 F.2d 150, 150 (2d Cir.1989) (per curiam); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Because the purpose of a preliminary injunction is to preserve the status quo, its issuance will generally not be overturned on appeal unless the district court abused its discretion. See Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 755, 106 S.Ct. 2169, 2175, 90 L.Ed.2d 779 (1986). We examine the likelihood of success first.
 
 A. Likelihood of Success on the Merits
 1. Fiduciary Duty
 
 11
 The seminal case on the fiduciary duty of partners under New York law, which governs this diversity case, is Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928). In Meinhard, plaintiff and defendant entered into a joint venture that was found to be the equivalent of a partnership. Defendant converted the joint assets, without plaintiff's knowledge, by entering into a lease arrangement with a third-party that excluded plaintiff. Likening a managing partner to a trustee, Chief Judge Cardozo wrote
 
 
 12
 Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.
 
 
 13
 Id. at 464, 164 N.E. 545.
 
 
 14
 New York's most recent pronouncement on a partner's duties is in Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989). There, plaintiffs and defendant were partners engaged in operating and managing a shopping center. The issue was whether defendant could hire a woman--who later became his wife--to develop the partnership property without the consent of his copartners. New York's highest court held that the defendant violated his fiduciary duty to the plaintiffs in two ways: he was not entitled to compensate a third party for services he was obligated to provide as part of his partnership duties, and he wrongfully engaged in self-dealing by entering into a transaction in which he placed his spouse's interest ahead of the fiduciary duty owed his copartners. Id. at 466-467, 539 N.E.2d 574, 541 N.Y.S.2d 746. Thus, Birnbaum reaffirmed that a partner is bound by an "inflexible" rule of fidelity that excludes not only patent self-dealing, but insists on the avoidance of situations where the fiduciary's own interests bring into question the interests of those to whom he owes a duty of undiluted loyalty. Id. at 466, 539 N.E.2d 574, 541 N.Y.S.2d 746.
 
 
 15
 Defendants' attempt to distinguish the instant case from Birnbaum is unpersuasive. Concededly, Birnbaum involved a general partnership, not a limited partnership, a transaction with a partner's spouse, not a company owned by a partner, and a general partner who was not authorized to hire employees, not a general partner who may hire employees for a fair and reasonable compensation. These factual distinctions are irrelevant in the light of those broad legal principles that govern a fiduciary's conduct.
 
 
 16
 In the case at hand, Schlesinger engaged in business transactions with companies he owned or controlled by making loans to Adson at interest rates above prime rate and by using Adson's funds to defend himself in this suit--something not permitted under New York's Limited Partnership Law, see N.Y. Partnership Law Sec. 115-c(5) (McKinney 1988)--creating the presumption of a direct conflict between his fiduciary obligation as general partner of Adson and his pecuniary interest in his companies. In so doing, he demonstrated that his preference for himself came before his duty as a fiduciary of Adson. Thus, the likelihood of showing a breach of Schlesinger's fiduciary duty is probable.
 
 
 17
 Defendants further contend that the district court held the general partner to a duty of loyalty to the limited partnership higher than that of a corporate director to a corporation. They urge that the proper standard for determining whether a general partner has breached his fiduciary duty is whether the transaction is fair and reasonable and in the limited partnership's best interests. To support that proposition, they rely primarily on Lichtyger v. Franchard Corporation, 18 N.Y.2d 528, 223 N.E.2d 869, 277 N.Y.S.2d 377 (1966) and Riviera Congress Associates v. Yassky, 18 N.Y.2d 540, 223 N.E.2d 876, 277 N.Y.S.2d 386 (1966). In Lichtyger and Yassky, the issue was whether certain limited partners could bring a class action on behalf of the other limited partners or a derivative action on behalf of the partnership. The New York courts analogized a partnership to a corporation and stated that a limited partner, like a shareholder, had a right to bring a representative action against the directors.
 
 
 18
 Although the district court mistakenly believed that there is a less strict duty of loyalty owed by a corporate director than that owed by a general partner, our disagreement with the district court on this point does not change the correctness of the result it reached. New York makes no distinction between the fiduciary duty owed by a general partner and that owed by a corporate director. One is not greater, and the other lesser. Both are bound by the same rule of fair-dealing with limited partners or shareholders who rely on the integrity of the general partner and corporate directors who are empowered under N.Y. Partnership Law Sec. 98 (McKinney 1988) and N.Y.Bus.Corp.Law Sec. 701 (McKinney 1988), respectively, to manage the business into which those passive investors have placed their funds. See Lichtyger, 18 N.Y.2d at 536, 223 N.E.2d 869, 277 N.Y.S.2d 377.
 
 
 19
 Defendants also rely on Yassky for the proposition that a general partner's duty is defined by whether the terms of any affiliated transaction are fair, reasonable, and made in good faith. A good faith standard was employed in Yassky because the partnership agreement in that case permitted self-dealing. Where the partnership agreement does not specifically authorize self-dealing, as here, Yassky is not to be read to countenance that which would otherwise be impermissible and wrongful. See Yassky, 18 N.Y.2d at 548, 223 N.E.2d 876, 277 N.Y.S.2d 386. Thus, a general partner is held to the same stringent duty of loyalty owed by a corporate director.
 
 2. Duty of Loyalty
 
 20
 Having established the law regarding the general partner's duty of loyalty, we examine the transactions engaged in here. "Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders." Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 264 (2d Cir.1984); see Alpert v. 28 Williams St. Corp., 63 N.Y.2d 557, 570, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984). This evidence includes "efforts taken to simulate arm's length negotiations," the establishment of an independent panel to evaluate the transaction and the timely approval by the disinterested parties after complete disclosure of the circumstances and material elements of the transaction. Id. at 570-71, 483 N.Y.S.2d 667, 473 N.E.2d 19; see also Pepper v. Litton, 308 U.S. 295, 306-07, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) ("The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.").
 
 
 21
 In the instant case, Schlesinger, as the interested party, has the burden of proving the overall fairness of the self-interested transactions. He argues that the self-interested transactions and loans were on commercially reasonable terms, taken in good faith and beneficial to the partnership. Defendants contend that the Schlesinger-owned companies provided essential services to Adson and that the use of "in-house" general contracting, management and sales forces was actually advantageous to the partnership because they were willing to delay payment and perform on a moment's notice. There has been no evidence of "arm's length negotiations," competitive bidding, or review and approval by the limited partners. Thus, the district court was entitled to conclude that the plaintiffs were likely to succeed on the merits of their claim.
 
 3. Consent
 
 22
 Defendants further contend that plaintiffs consented to the self-interested transactions through the partnership agreement and their conduct. A partner need only prove a self-interested transaction to be fair in those cases when the limited partners consent to self-dealing either through the partnership agreement or by their conduct. The authorization to engage in self-dealing must be clear and explicit. See, e.g., Renz v. Beeman, 589 F.2d 735, 745 (2d Cir.1978) ("[o]nly the most explicit language can protect a fiduciary from liability in a conflict of interest with his cestuis "), cert. denied, 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). In the case at bar, the partnership agreement contains no such authority. This lack of authorization contrasts with the partnership agreement of Dalewood Associates--another limited partnership in which Schlesinger is a general partner--which contains such a clause expressly permitting transactions with affiliated persons.
 
 
 23
 Nor was the district court required to find plaintiffs' consent to the self-interested transactions predicated on their failure to object to the compensation of a Schlesinger-owned company over two years ago. Mere acquiescence to a self-interested payment does not constitute a modification of the partnership agreement. Therefore, it was not error for the district court to conclude that plaintiffs would likely succeed on their present claims despite the fact that they may have acquiesced to a similar transaction in the past.
 
 
 24
 Defendants also dispute the feasibility of competitive bidding to renovate the vacant apartments because the work varies from apartment to apartment and vacancies are sporadic and unpredictable. The district court could properly find that the nature of the renovation work would not prevent the partnership from seeking competitive bids. There is no doubt that such work would have been performed after competitive bidding, absent Schlesinger's self-dealing. In addition, defendants' suggestion that Schlesinger was chosen as general partner because of his "in-house" construction capabilities also does not make plaintiffs' position untenable; nowhere in the partnership agreement is there a suggestion that the general partner should renovate the apartments through his self-owned company.
 
 
 25
 Defendants' showing was insufficient to require the district court to be persuaded that they could establish the fairness of the self-interested transactions; here there is a likelihood that plaintiffs can prove that Schlesinger as a general partner violated his duty of loyalty to the limited partners. Consequently, plaintiffs demonstrated a strong likelihood of success on the merits.
 
 B. Irreparable Harm
 
 26
 We turn now to analyze whether plaintiffs have also shown irreparable harm. To establish irreparable harm, plaintiffs must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." Consolidated Brands, Inc. v. Mondi, 638 F.Supp. 152, 155 (E.D.N.Y.1986); accord Kaplan v. Board of Educ. of the City School Dist., 759 F.2d 256, 259 (2d Cir.1985); Salant Acquisition Corp. v. Manhattan Indus., 682 F.Supp. 199, 202 (S.D.N.Y.1988). The injury must be one requiring a remedy of more than mere money damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation. Bankruptcy is such a case. See Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); Sperry Int'l Trade, Inc. v. Government of Israel, 670 F.2d 8, 12 (2d Cir.1982).
 
 
 27
 Here there is ample evidence of plaintiffs' imminent bankruptcy, absent the issuance of a preliminary injunction. Current liabilities exceed current assets, and plaintiffs are obligated on three loans totaling $2,245,000, all due on demand. Two of these loans, amounting to $875,000, are controlled by Schlesinger and Weinstein, as individuals and co-owners of Mark David Associates, who could demand payment at any time and, as noted by the district court, "bring down the whole house of cards." Tucker Anthony Realty Corp. v. Schlesinger, No. 88-0868, slip op. at 9, 1989 WL 8138 (E.D.N.Y. Jan. 27, 1989).
 
 
 28
 Defendants urge that the danger of bankruptcy is speculative because Schlesinger would not rationally decide to demand payment because of his personal liability for Adson's debts. Although appealing on the surface, this argument upon reflection ignores Adson's precarious financial situation and Chemical Bank's ability to demand immediate payment of its $1,370,000 loan. That shaky situation provides ample incentive for Schlesinger and Weinstein to attempt to limit their financial exposure by having their loans repaid ahead of Chemical Bank's. In addition, defendants' argument that there is no causal connection between the self-interested transactions and the danger of bankruptcy is specious. As noted, it is the right possessed by Schlesinger and Weinstein to demand immediate payment that makes the likelihood of bankruptcy more than merely speculative. Hence, irreparable harm has been adequately demonstrated.
 
 III
 
 29
 It is on this basis that we find the narrowly tailored injunctive relief provided--preventing the payment to Schlesinger or Schlesinger-controlled companies without leave of court--necessary to prevent toppling the limited partnership into bankruptcy. Thus, the judgment granting a preliminary injunction is affirmed.