**EMONS INDUSTRIES, INC., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

**No. 90 Civ. 5603 (PKL).**

United States District Court,
S.D. New York.

Nov. 7, 1990.

Anderson, Kill, Olick & Oshinsky, P.C., New York City (John H. Doyle, III, David

M. Zensky, Elizabeth J. Millstein, Eric Statman, of counsel), for plaintiff.

Cuyler, Burk & Matthews, New York City (Stefano V. Calogero, Peter Petrou, Cynthia A. Catino, Karla Donovan, of counsel), for defendant.

## ORDER & OPINION

### LEISURE, District Judge:

This is an action for declaratory and injunctive relief, and for monetary damages, arising from defendant Liberty Mutual Insurance Company's ("Liberty") alleged breaches of its contractual and fiduciary duties owed to its insured, Emons Industries, Inc. ("Emons"). Emons now comes before the Court on a motion for a preliminary injunction enjoining Liberty from interfering in any way with the attorney-client relationship between Emons and its counsel, Anderson, Kill, Olick & Oshinsky ("the Anderson Firm"), and enjoining Liberty from withholding certain indemnification and attorneys' fees payments due Emons.

## BACKGROUND

Emons is a New York corporation primarily engaged in the boxcar leasing business. As the corporate successor to a number of pharmaceutical companies, Emons has been sued in numerous product liability cases arising out of the sale by those companies of diethylstilbestrol ("DES"). Liberty is a Massachusetts mutual insurance company and is Emons's insurer with respect to DES lawsuits pursuant to comprehensive general liability insurance policies ("the Policies") issued by Liberty to Emons and its corporate predecessors between 1945 and 1970.

In 1975, Emons was first sued in a DES-related lawsuit. Emons notified Liberty, and requested that Liberty defend Emons in the suit and indemnify Emons if Emons were found liable. Liberty refused the defense and coverage requests and Emons thereafter retained on its own behalf the firm of Greenberg, Irwin, Pellman & Slade ("the Greenberg Firm") to represent Emons in both the burgeoning number of DES lawsuits, as well as in a suit against Liberty seeking coverage under the Policies ("the Coverage Action").

In 1978, Emons and Liberty reached an interim settlement of the Coverage Action ("the Interim Settlement"), which provided that Liberty pay for Emons's costs in defending against the DES cases. Emons apparently continued to control its defense of the DES cases through counsel chosen by Emons. Through 1980, Emons was represented by the Greenberg Firm, which then split its membership and Emons's counsel became the firm of Slade, Pellman & Biehl. In 1982, Slade, Pellman & Biehl became Slade & Pellman. These firms successively represented Emons in the DES cases, with Liberty, pursuant to the Interim Settlement, paying all of Emons's defense costs. At the same time, these successive firm entities represented Emons in the Coverage Action against Liberty.

In 1988, Emons (represented by Slade & Pellman) and Liberty reached a final settlement of the Coverage Action ("the Settlement Agreement"), pursuant to which Liberty agreed to continue paying Emons's DES defense costs and to pay indemnification to Emons subject to per claim and aggregate limits, as well as limits on coverage of so-called "third generation claims."[1] In 1989, Slade & Pellman became Slade, Moross, Rahl, Glatzer & Stamm ("Slade Moross").

On April 13, 1990, Jeffrey L. Glatzer, Esq. ("Glatzer"), a Slade Moross partner, informed Liberty DES Claims Examiner Jerry Clark ("Clark") that Slade Moross would be merging with the Anderson Firm. Clark indicated that he did not believe Liberty would object to the Anderson Firm defending the DES cases. The parties dispute whether during this conversation Glatzer informed Clark that the Anderson Firm represented interests adversarial to Liberty in certain unrelated coverage actions. On

---

**1.** "Third generation" DES claims are claims made by the grandchildren of women who ingested DES.

May 1, 1990, Slade Moross merged into the Anderson Firm, the Slade Moross attorneys involved in representing Emons prior to the merger continuing in that capacity as members of the Anderson Firm. On the same day as the merger, Liberty informed Glatzer that it would not agree to the Anderson Firm continuing in the role of DES counsel, in which role Slade Moross and its predecessor firms had served. Liberty stated that its basis for objecting was the Anderson Firm's involvement in unrelated coverage actions against Liberty.

On July 25, 1990, Liberty informed Emons that Liberty was assigning defense of the DES cases to another firm, Jacobson & Triggs, and that, if Emons refused to cooperate in the transfer of counsel, Liberty would no longer defend Emons in the DES cases, nor would it indemnify Emons under the Settlement Agreement or the Policies. On August 2, 1990, Emons brought suit against Liberty, Jacobson & Triggs and John F. Triggs, Esq. ("Triggs") in New York Supreme Court, County of New York, seeking a declaration of rights and a permanent injunction enjoining Liberty from interfering with Emons's attorney-client relationship with the Anderson Firm. Emons also sought monetary damages, including any unpaid defense or indemnity payments ("Coverage Payments") due Emons since May 1, 1990.

On August 13, 1990, Justice Ira Gammerman granted a request by Emons for a temporary restraining order preventing Liberty from interfering with Emons's relationship with the Anderson Firm, but refused to enjoin Liberty from withholding Coverage Payments pending a hearing on Emons's pending motion for a preliminary injunction. The case was subsequently removed to this Court, and, pursuant to a stipulation entered into between Emons on the one hand, and Jacobson & Triggs and Triggs ("the Triggs defendants") on the other, Emons's claims against the Triggs defendants were dismissed with prejudice on October 3, 1990. On October 4, 1990, the Court denied Liberty's motion to dismiss the Anderson Firm from representing Emons in this action. On October 9 and October 10, 1990, hearings were held on Emons's motion for a preliminary injunction. That latter motion is now before the Court.

## DISCUSSION

"A party seeking a preliminary injunction must demonstrate that it is likely to suffer possible irreparable harm if the requested relief is not granted and 'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" *Citibank v. Nyland (CF8), Ltd.,* 839 F.2d 93, 97 (2d Cir.1988) (quoting *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982)); *see also Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989); *Consolidated Gold Fields, PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.1989). The Court thus turns to analyze whether Emons has met these requirements.

### 1) Irreparable Harm

■ The Second Circuit has repeatedly stressed the importance of a showing of irreparable harm by a party moving for a preliminary injunction. "[I]nequitable conduct alone cannot justify the entry of a preliminary injunction. The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction." *Buckingham Corp. v. Karp,* 762 F.2d 257, 262 (2d Cir.1985). "'"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."'" *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Corp.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 at 431 (1973) (footnote omitted))).

"Irreparable injury" has been defined by the Second Circuit as "one that cannot be redressed through a monetary award.

Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray–Wrap Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Therefore, the irreparable harm alleged "must be one requiring a remedy of more than mere monetary damages. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony, supra*, 888 F.2d at 975; *see also Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917–18 (2d. Cir. 1986); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). In addition, a plaintiff seeking to establish irreparable injury "must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'" *Tucker Anthony, supra*, 888 F.2d at 875 (quoting *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155 (E.D.N.Y.1986)).

In the present action, the parties do not dispute that Liberty is refusing to make the Coverage Payments to Emons unless Emons severs its attorney-client relationship with the Anderson Firm with respect to representation of Emons in the DES cases. Emons argues that this refusal presents Emons with two options, either of which would cause Emons irreparable injury: 1) termination of Emons's longstanding relationship with its attorneys in the midst of numerous lawsuits, or 2) loss of the Coverage Payments and resulting bankruptcy or inability to defend or settle the DES cases. The Court agrees with this argument.

The Second Circuit has long recognized that the relationship between a client and the attorney of his or her choice is one that should not be readily disrupted. *See, e.g., Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983); *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979); *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978). As the Court stated in *Government of India*, in the context of a motion to disqualify counsel, a client who is forced to relinquish counsel of his or her choice "incurs a loss of time and money in being compelled to retain new counsel who in turn have to become familiar with the prior comprehensive investigation which is the core of modern complex litigation. The client may moreover lose the benefit of its longtime counsel's specialized knowledge of its operations." *Government of India, supra*, 569 F.2d at 739.

In the instant situation, Emons is the defendant in some three hundred DES cases nationwide. Emons's DES attorneys, now members of the Anderson Firm, have represented Emons in these and similar actions since the first DES-related suit was brought against Emons in 1975. Local counsel, with some exceptions in California, have acted as mere local liaisons, the Anderson Firm and its predecessor firms serving as National Coordinating Defense Counsel, and thus as the real source of decision-making with respect to the defense of the cases. Moreover, the pending DES cases are actively proceeding at this time, with discovery and settlement negotiations in full swing in many instances. Finally, the DES cases themselves are extremely complex in nature, involving issues of medical causation, regional and market share involvement, and evidence of events occurring twenty to forty years ago.

Liberty does not dispute the foregoing, but rather asserts that substitute counsel can step in at this point and defend Emons with similar ability and effectiveness. The facts, however, recited above, lead to the contrary conclusion that replacement of Emons's longtime DES counsel at this stage of the DES cases would seriously interfere with the effective defense of those cases. Emons's present DES counsel offer the invaluable and irreplaceable benefit of experience, having served for over a decade in that role as both legal counsel and factual repository with respect to the DES cases.[2] The concerns voiced by the Second Circuit in *Government of India, supra*, 569 F.2d at 739, are thus present here, where the litigation is complex and

---

2. The importance of that role is all the greater, given the fact that Emons itself has never been involved in the production of either DES specifically, or pharmaceuticals in general.

present counsel have developed specialized knowledge critical to the effective representation of the client.

Liberty's "suggestion" that Emons replace the Anderson Firm with Jacobson & Triggs does not remedy the problem. Although John Triggs, Esq., had been a partner at Slade & Pellman involved in representing Emons in the DES cases, he left Slade & Pellman over three-and-a-half years ago, in March 1987.[3] Much has transpired during that time with respect to the DES cases, and the Court has little doubt that, although Mr. Triggs might be a better choice to represent Emons than many other lawyers, he does not have the *present* knowledge and experience that Emons's present DES counsel have.

Requiring Emons to transfer representation of it in the DES cases to another lawyer or firm would thus have "an immediate adverse effect" on it, *Nyquist, supra*, 590 F.2d at 1246, by forcing Emons to accept less effective counsel. The resulting injury to Emons would be irreparable, as it would be impossible to quantify the harm suffered, and therefore impossible to compensate for it with money damages. *See Gerard v. Almouli*, 746 F.2d 936, 939 (2d Cir.1984) ("irreparable injury" exists where "it would be impossible to produce an accurate money damages figure"); *Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631, 644 (2d Cir.1979) ("irreparable injury" is shown where "interim damages cannot be calculated with sufficient accuracy to make damages an adequate substitute"); *New York State Motor Truck Association v. City of New York*, 654 F.Supp. 1521, 1540 (S.D.N.Y.) ("Irreparable injury is suffered ... where monetary damages cannot be calculated to a reasonable degree of certainty"), *aff'd*, 833 F.2d 430 (2d Cir.1987).

The other option presented to Emons by Liberty is that Emons continue to retain the Anderson Firm in the DES cases, but forgo the Coverage Payments. Given Em-ons's frail financial condition, however, the Court is convinced that without the Coverage Payments, Emons's ability to settle effectively the pending DES cases will be substantially hindered, and that Emons's rapidly mounting defense costs will create a serious threat to Emons's continued solvency.

Emons has presented evidence of its financial condition, both for the year ended June 30, 1990 (Plaintiff's Exhibit 4) and for the two months ended August 31, 1990 (Plaintiff's Exhibit 5). Although the financial statements presented to the Court are unaudited,[4] the Court finds no reason to doubt their reliability for purposes of these proceedings. The statements, in combination with other evidence presented, show that Emons has approximately $300,000 in cash, before payment of DES defense costs for August, September and October, out of which operating expenses must be paid. The statements also reflect that Emons has an approximate monthly net income of $7,000. It is also worth noting that Emons emerged from Chapter 11 bankruptcy proceedings less than four years ago.

Emons is presently involved in negotiating settlements of 25 to 30 DES cases. Withholding of the Coverage Payments would render impossible the settlement of some or all of these cases, and thus settlement opportunities advantageous to Emons would be lost. The value of these lost opportunities mutually to resolve the DES cases cannot be readily determined with sufficient accuracy, as the costs and uncertainties of litigation are multifarious. Consequently, the injury to Emons is effectively irreparable, as "interim damages cannot be calculated with sufficient accuracy to make damages an adequate substitute." *Ives Laboratories, supra*, 601 F.2d at 644. Furthermore, the Supreme Court has held that where a district court denies parties to a litigation the right to enter into a mutually agreeable settlement agreement, the court "effectively order[s] the parties to

---

**3.** At that time, Emons declined Triggs's offer to replace Slade & Pellman with Jacobson & Triggs.

**4.** Emons is a subsidiary of Emons Holdings, which is a public company. As a subsidiary, Emons does not prepare a separate audited statement regarding its operations.

proceed to trial and to have their respective rights and liabilities established within limits laid down by that court." *Carson v. American Brands, Inc.*, 450 U.S. 79, 87, 101 S.Ct. 993, 998, 67 L.Ed.2d 59 (1981). Where this prevents the settlement agreement from being consummated, it has "the 'serious, perhaps irreparable consequence' of denying the parties their right to compromise their dispute on mutually agreeable terms." *Carson, supra,* 450 U.S. at 88, 101 S.Ct. at 998.

Moreover, Emons has presented a convincing argument that it will be unable to finance the defense of the DES cases for more than a short period of time. The cost to Emons of defending the DES cases is currently estimated to be $50,000 to $60,000 per month. At $6,000 to $7,000 per month, Emons's net income is obviously totally insufficient to pay these legal bills. Emons's cash reserve of $300,000, reflected in its August 1990 financial statement, must, in determining its significance with respect to this issue, be reduced by three months of unpaid defense costs already incurred (August through October) plus an unknown amount of operating expenses. This leaves—at most—$150,000 to pay for future defense costs. Furthermore, as long as the Coverage Payments are withheld, any amounts owed by Emons to satisfy judgments against it must be paid by Emons, further reducing, and probably eradicating, Emons's financial resources. In short, the withholding of the Coverage Payments will put Emons in a position of having to bankrupt itself shortly in order to defend itself.

It is firmly established that "[a] threat to the continued existence of a business can constitute irreparable injury" warranting the issuance of a preliminary injunction. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978) (citation omitted), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *see also Tucker Anthony, supra,* 888 F.2d at 975 (bankruptcy is damage that cannot be rectified by financial compensation); *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1153 (2d Cir.1986) (irrevocable destruction of business, resulting in bankruptcy or liquidation, constitutes irreparable injury); *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 491 (S.D.N.Y. 1989) (threatened destruction or catastrophic impairment of an ongoing business warrants injunctive relief); *Stanley–Fizer Associates, Inc. v. Sport–Billy Productions Rolf Deyhle*, 608 F.Supp. 1033, 1035 (S.D. N.Y.1985) (loss of business that is commercially life-threatening can constitute irreparable harm).

The Supreme Court squarely considered this question in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). In *Doran,* appellant law enforcement officials in North Hempstead, New York, attempted to enforce a town ordinance banning topless dancing. Appellees Salem Inn and other local bars sought and obtained from the District Court an injunction banning enforcement of the statute. The Second Circuit affirmed, and appellant appealed. The Supreme Court, in turn, upheld the injunction, finding that "absent preliminary relief [appellees] would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran, supra,* 422 U.S. at 932, 95 S.Ct. at 2568.

Liberty argues that Emons will not suffer irreparable injury because the Anderson Firm will choose not to demand payment of the DES-related legal bills owed it. The Court, however, strongly doubts that the Anderson Firm will, in the face of a denial of the injunctive relief sought by Emons herein, forgo billings of $50,000 to $60,000 per month for more than a very short period of time. Contrary to Liberty's assertion that this Court can promptly hear and decide this action on the merits, final disposition could easily require a wait of one year. Liberty has informed the Court that it will be conducting additional discovery,[5] and Emons may well de-

5. Indeed, both the Court and Emons were pre-   pared to consolidate the preliminary injunction

sire the same. The parties must then prepare a joint pre-trial order, before the case will even be placed on the trial ready list. The current lag between the time a case is placed on the trial ready list and time of trial can be as much as eight months. Moreover, this Court is presently scheduled to conduct a two-month criminal trial beginning in late January, and a nine to twelve-month criminal trial commencing in early May, both of which must be given priority over civil trials. In sum, the Anderson Firm cannot reasonably be expected to forgo what could easily amount to over half a million dollars in fees.

Finally, Liberty argues that even if the DES cases must go undefended, and default judgments are entered against Emons, the injury to Emons can be compensated by payments of damages equal to the amounts of the default judgments. Yet as Emons correctly points out, such judgments could easily push Emons into bankruptcy, leaving only the trustee to collect the damages payments from Liberty. Such a result would without question constitute an irreparable injury such that injunctive relief is justified. *See Doran, supra,* 422 U.S. at 932, 95 S.Ct. at 2568.

The Court thus finds that Emons is presented with a Hobson's choice of two alternatives, either of which will cause it irreparable injury. *Cf. Salem Inn, Inc. v. Frank,* 501 F.2d 18, 21 (2d Cir.1974), *aff'd in part and reversed in part on other grounds, Doran, supra,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (bar owner presented with choice of either deprivation of First Amendment rights or threat of bankruptcy suffers irreparable injury). The Court therefore turns to the remaining requirements for granting injunctive relief.

*2) Likelihood of Success on the Merits*

At the outset, the Court notes that where a movant seeks injunctive relief by showing a likelihood of success on the merits, the movant "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985) (citations omitted). With this standard in mind, the Court will consider the likelihood Emons will succeed on the merits.

■ Emons argues that pursuant to the Settlement Agreement, Liberty is precluded from interfering in any way with Emons's attorney-client relationship with the Anderson Firm, and from modifying or terminating the Coverage Payments. Section 5.6 of the Settlement Agreement, entitled "Selection of Counsel," reads, in part: "Liberty and Emons intend to have the defense of the DES actions continue in its present manner so long as quality representation is being provided in a cost effective manner. To the extent these criteria are met, Liberty shall continue to use Slade & Pellman as lead and coordinating counsel on behalf of Emons.... The determination as to whether the criteria are being met shall be made by Liberty after consultation with Emons...." [6] As Liberty has

---

hearing in this action with a trial on the merits. Fed.R.Civ.P. 65(a)(2). Liberty objected, however, stating that it wanted time to conduct additional discovery. Because Liberty chose not to waive its jury demand, the Court could not consolidate.

**6.** Section 5.6 of the Settlement Agreement reads in full as follows: "Liberty and Emons agree that they are satisfied with the manner in which the DES actions have been defended. Liberty and Emons intend to have the defense of the DES actions continue in its present manner so long as quality representation is being provided in a cost effective manner. To the extent these criteria are met, Liberty shall continue to use Slade & Pellman as lead and coordinating counsel on behalf of Emons, and local counsel shall be used as attorneys of record where necessary outside of New York State. The determination as to whether the criteria are being met shall be made by Liberty after consultation with Emons and after taking into account Slade & Pellman's representation of Emons not only in DES matters, but also in Emons' bankruptcy proceedings and other corporate matters which affect and are affected by Emons' involvement in DES actions. Emons will insure that lead counsel: (i) shall provide Liberty with copies of all correspondence between Emons and lead counsel, and lead counsel and local counsel relating to the DES lawsuits and with quarterly reports as to the status of and developments in each DES lawsuit or such other status reports as Liberty may require; (ii) shall advise Liberty as soon as

not even suggested that the Anderson Firm has failed to provide "quality representation ... in a cost effective manner," the question for the Court becomes whether there exists some other ground on which, consistent with the Settlement Agreement, Liberty has the right to withhold the Coverage Payments.

Liberty argues that, as an indemnifying insurer, it has the right to control the defense of its insured, including the right to select its counsel. As discussed, *infra,* there is no basis for such a blanket assertion. Moreover, the Settlement Agreement specifically provides for the selection of counsel in Section 5.6, and those terms govern unless they are against public policy, which they clearly are not. *New York State Urban Development Corp. v. VSL Corp.,* 738 F.2d 61, 66 (2d Cir.1984) (terms of insurance contract govern unless against public policy). As discussed in the Court's Order and Opinion dated October 4, 1990, ("October 4 Order"), the Court has found that prior to the conclusion of the Settlement Agreement, Emons effectively controlled the defense of the DES cases. October 4 Order at 8–10. Nothing presented to the Court in the interim has altered that finding. Likewise, the Court again finds that the clear language of Section 5.6 stating that the parties "intend to have the defense of the DES actions continue in its present manner," more than sufficiently indicates an intent that Emons would continue to control the defense of those actions. *Cf.* October 4 Order at 11. Section 5.6 protects Liberty by giving it the right, after consulting with Emons, to determine whether "quality representation is being provided in a cost effective manner." If such representation is not being provided, then, but only then, is Liberty entitled to replace Emons's DES counsel.

Liberty also attempts to evade the dictates of Section 5.6 by arguing that its obligations thereunder ended when the firm of Slade & Pellman ceased to exist. Yet the parties' course of dealing over a period of more than a decade prior to this action strongly suggests that such an interpretation is one merely of convenience to Liberty. During the ten years between the time the parties entered into the Interim Agreement and the Settlement Agreement, Emons's DES counsel changed form twice, and in neither instance did Liberty object or claim that the selection of counsel provision in the Interim Agreement no longer applied. Likewise, after the Settlement Agreement was signed, Slade & Pellman ceased existing and became Slade Moross, without objection from Liberty or a claim that Section 5.6 no longer controlled.

From this history the Court must infer that the intent of the parties throughout their relationship has been to continue to use a group of attorneys who had developed an expertise, both legal and factual, with respect to the DES cases, and that those attorneys constituted the firm of Slade & Pellman at the time Section 5.6 was written. "The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.,* 743 F.2d 85, 91 (2d Cir.1984) (citing *Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410 (1913); *see also Ottley v. Palm Tree Nursing Home,* 493 F.Supp. 910, 914 (S.D.N.Y.1980) ("Few things can better evidence the meaning of a contract than the actions of the parties themselves."). Thus the name of the firm representing Emons is not controlling as to who has the right to select Emons's DES counsel. Rather, Emons has retained, and continues to retain that right pursuant to the Settlement Agreement, limited by Liberty's right to require "cost effective" "quality representation." Absent a claim that the Anderson Firm will not provide such representation, Liberty cannot be heard, on the present record, to complain that its rights under Section 5.6 are being infringed. The Court therefore concludes that Emons has made the requisite show-

possible of all important developments in each pending DES action; (iii) shall provide Liberty with all information requested by Liberty; and

(iv) shall provide Liberty with access to all materials in their files pertaining to each pending DES action."

ing that it is likely to succeed on the merits in this action.[7]

Emons further argues that there exist conflicts of interest between it and Liberty with respect to the defense of the DES cases, and that in such a case Emons has a right to the counsel of its choice. Having already found Emons likely to succeed on the merits, as discussed, *supra,* the Court need not consider this argument. However, the Court concludes that this second argument provides an additional, separate basis for finding that Emons is likely to prevail on the merits.

It is firmly established by the case law and commentators that where conflicts of interest between an insurer and its insured arise, such that a question as to the loyalty of the insured's counsel to that insured is raised, the insured is entitled to select its counsel, whose reasonable fee is to be paid by the insurer. *Klein v. Salama,* 545 F.Supp. 175, 179 (E.D.N.Y.1982); *Public Service Mutual Insurance Company v. Goldfarb,* 53 N.Y.2d 392, 400, 442 N.Y.S.2d 422, 427, 425 N.E.2d 810, 814 (1981); *Hartford Accident and Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 228–29, 422 N.Y.S.2d 47, 54, 397 N.E.2d 737, 744 (1979); *Prashker v. United States Guarantee Co.,* 1 N.Y.2d 584, 154 N.Y.S.2d 910, 136 N.E.2d 871 (1956); *Penn Aluminum Inc. v. Aetna Casualty and Surety Co.,* 61 A.D.2d 1119, 402 N.Y.S.2d 877 (4th Dep't 1978); *see also Employers Insurance of Wausau v. Albert D. Seeno Construction Co.,* 692 F.Supp. 1150, 1155–57 (N.D.Cal.1988); *Point Pleasant Canoe Rental Inc. v. Tinicum Township,* 110 F.R.D. 166, 170 (E.D.Pa.1986); 7C Appleman *Insurance Law and Practice* § 4681 at 5 (1979 and 1990 supp.) ("Where the insurer lacks an economic motive for vigorous defense of the insured, or the insurer and insured have conflicting interests, the insurer may not compel the insured to surrender control of the litigation."). In the case at bar, the Court believes that substantial conflicts of interest exist between Emons and Liberty regarding defense of Emons in the DES cases. First, a majority of the claims pending against Emons are subject to $10,000 per claim and $150,000 per year indemnity limits, but seek in excess of $10,000. Liberty thus has a strong interest in reducing the defense costs it must pay by quickly settling these cases irrespective of whether they are reasonable or are within the per claim limit. Emons's interest, in contrast, is in vigorously defending these suits and obtaining the lowest possible settlement or judgment. Similarly, Liberty has an interest in quickly settling cases so as to limit defense costs while reaching the annual aggregate indemnity limit, whereas Emons would want to defend fully each case.

In addition, because Liberty's obligation to pay defense costs for so-called "third generation" claims terminates when such claims are severed from associated first or second generation claims, Liberty's interest is in obtaining quick settlements of such first and second generation claims, whether or not they are reasonable or within policy limits. Emons's interest, of course, is in fully defending against all claims, thereby

---

**7.** Liberty argues that the Anderson Firm, by virtue of its involvement in unrelated coverage actions against Liberty, has a conflict of interest such that it cannot represent Emons in the DES cases over Liberty's objection. This argument is without merit. First, to the extent Liberty contends that in representing Emons the Anderson Firm would also be representing Liberty, this contention has previously been considered and rejected by the Court, and need not be revisited. October 4 Order at 6–13. Second, Liberty's claim that Disciplinary Rule 7–104(A)(1) bars the Anderson Firm from representing Emons is likewise unpersuasive. Rule 7–104(A)(1) reads as follows: "During the course of a representation of a client a lawyer shall not ... [c]ommu- nicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so." Liberty has presented the Court with no evidence that any of the Anderson Firm attorneys involved in the unrelated coverage actions have, or will have, any contact with Liberty's employees, and the Court will not presume that those attorneys will violate Rule 7–104(A)(1). *Cf. United States v. Hammad,* 858 F.2d 834, 837 (2d Cir.1988) ("The federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar.").

achieving the lowest possible settlements or judgments.

Finally, because Liberty is not responsible for indemnifying Emons as to punitive damage awards, Liberty has no interest in defending against such claims, whereas Emons obviously has. *See, e.g., Public Service Mutual Insurance Co. v. Goldfarb*, 53 N.Y.2d 392, 400, 442 N.Y.S.2d 422, 426–27, 425 N.E.2d 810, 814–15 (1981) (noting that punitive damages may not be insured against under New York law, and thus holding that the insurer's interest in defending a suit containing such a claim was in conflict with the insured's interest, and thus the insured was entitled to defense by an attorney of his own choosing, to be paid by the insurer). Given these significant conflicts of interest, Emons has the right to counsel of its choice, with reasonable fees to be paid by Liberty.

*New York State Urban Development Corp. v. VSL Corp.*, 738 F.2d 61 (2d Cir. 1984), cited by Liberty, is inapposite. In *VSL*, the issue presented was whether, *under the terms of the insurance policy in that case*, the insured or the insurer could designate counsel to represent the insured, where a conflict of interest between the two existed. The Second Circuit held that where an insurance contract explicitly provides that the insurer is not obligated to pay its insured's defense costs unless it consents to the choice of counsel, the insured does not have the right to counsel of its choice. *VSL, supra*, 738 F.2d at 66. In such a case, the contract's provisions govern, rather than the general rule that the insured may choose its counsel. *VSL, supra*, 738 F.2d at 65–66 (distinguishing those cases in which the insurance contract did not condition the payment of defense costs on consent of the insurer to the selec-

tion of counsel). In the present case, no such language is to be found, either explicitly or implicitly,[8] and thus the rule in *VSL* does not alter the Court's conclusion here that Emons, and not Liberty, has the right to select the counsel to defend Emons in the DES cases.[9]

As the Court has concluded that Emons is likely to succeed on the merits on at least two legal theories, the Court need not, and will not consider Emons's additional alternative theories of breach of fiduciary duty and waiver and estoppel. Rather, the Court turns to a balancing of the equities.

### 3) Balancing of the Equities

The test for granting a preliminary injunction requires a showing of two elements: 1) irreparable harm *and* 2) *either* (a) a likelihood of success on the merits *or* (b) serious questions going to the merits and the balance of hardships tipping decidedly in favor of the moving party. *Nyland*, 839 F.2d at 97. The second prong of the test is disjunctive in structure, not conjunctive. Therefore, having found that Emons is likely to succeed on the merits, a weighing of the equities would not be necessary to a finding that injunctive relief is warranted. Nevertheless, the Court has undertaken that balancing, and finds that it tips sufficiently in favor of Emons to satisfy the requirements prescribed by the Second Circuit.

As the Court's discussion with respect to the likelihood of Emons succeeding on the merits plainly shows, there are in this litigation sufficiently serious questions going to the merits to make them a fair ground for litigation. As to the equities in this case, if the instant motion for injunctive relief is denied, Emons will face a choice of

---

**8.** Pursuant to Section 5.6 of the Settlement Agreement, Liberty does have a voice in determining whether Emons's existing counsel in the DES cases is providing quality representation at a reasonable fee. This is a far cry from the right to veto the insured's choice of counsel found in the policy in *VSL*.

**9.** Liberty argues that no conflicts of interest exist, and that proof of this is found in the fact that, to date, no instances of Liberty having conducted the defense of the DES cases to Em-

ons's detriment have occurred. This reasoning is specious at best. No such instances have occurred as of yet because Liberty has *not* been conducting the defense of the DES cases, and thus has not had the opportunity to take advantage of that position of control. The very reason the insured is given the right to select its counsel in conflict of interest cases is so that those conflicts are never allowed to affect the litigation.

two, serious, irreparable injuries, detailed by the Court, *supra,* either of which tips the balance of hardships considerably in its favor.

Weighed against this consideration are Liberty's wholly speculative claims of the harms it will suffer if Emons's request for a preliminary injunction is granted. Those injuries are alleged to be twofold: First, that permitting the Anderson Firm to represent Emons in the DES cases will provide the Anderson Firm with opportunities to violate the Disciplinary Rules by discussing the unrelated coverage actions with Liberty employees. As the Court has already stated, *supra,* the Court will not, *ex ante,* conclude that members of the Bar in good standing will lightly disregard the professional responsibility standards of the profession. Liberty has not alleged that the Anderson Firm has ever improperly sought to communicate with Liberty employees to date, and there is no reason to speculate that that will change. Moreover, if improper communications were to occur, appropriate action could and would be taken by the Court at such time.

Liberty also asserts that granting injunctive relief to Emons would force Liberty "to provide financial aid and comfort to an established adversary," the Anderson Firm, thereby requiring Liberty "to play the role of the sacrificial lamb." Brief of Liberty Mutual Insurance Company in Opposition to Plaintiff's Application for a Preliminary Injunction at 2. Setting aside the hyperbolic aspects of this phrasing, it is difficult to see how the fact that the Anderson Firm may benefit from its representation of Emons will unfairly affect Liberty. The Court rejects Liberty's zero-sum view of the relationships among the entities involved in the present action. The Court concludes that the balance of hardships weighs decidedly in favor of Emons, and thus issuance of a preliminary injunction is proper.

Pursuant to Fed.R.Civ.P. 65(c), Emons shall post a bond with the Clerk of the Court in the amount of $50,000. "The purpose of the injunction bond rule is to provide protection to a defendant who is under injunction in an equity action, but who ulti-mately prevails on the merits." *Commerce Tankers Corp. v. National Maritime Union of America, AFL–CIO,* 553 F.2d 793, 800 (2d Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). "[T]he amount of the security given by an applicant for an injunction is a matter for the discretion of the district court...." *Holborn Oil Trading Ltd. v. Interpetrol Bermuda Ltd.,* 658 F.Supp. 1205, 1211 (S.D.N.Y.1987); *see also United States v. Bedford Associates,* 618 F.2d 904, 916–17 n. 23 (2d Cir.1980). A bond of $50,-000 is sufficient to provide Liberty with the protection it requires.

## CONCLUSION

For the reasons stated herein, Emons's motion for a preliminary injunction is granted. Liberty is hereby enjoined from: (a) interfering in any way with the attorney-client relationship between Emons and the Anderson Firm in connection with the defense of the DES cases, whether or not now pending; (b) attempting in any way to substitute alternative defense counsel with respect to Emons's defense of the DES cases, whether or not now pending; and (c) modifying or terminating the Coverage Payments to be made pursuant to the Settlement Agreement.

Emons shall post a bond with the Clerk of the Court in the amount of $50,000. The effectiveness of the injunction granted by this order is conditioned on the posting of such a bond.

SO ORDERED.