959 F.2d 232
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
W. Wayne TIFFANY, Plaintiff-Appellee,
v.
FORBES CUSTOM BOATS, INCORPORATED, Defendant-Appellant.
 No. 91-3001.
 United States Court of Appeals,
Fourth Circuit.
 Submitted: April 8, 1991
Decided: April 6, 1992
Amended by order filed April 27, 1992
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (CA-90-43-2-CIV-BO)
 John G. Trimpi, Trimpi & Nash, Elizabeth City, N.C., for appellant.
 Edward A. O'Neal, Twiford, O'neal & Vincent, Elizabeth City, N.C., for appellee.
 E.D.N.C.
 Before RUSSELL and PHILLIPS, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 This is a suit which was initially instituted in the state court and removed to the district court on diversity grounds.[1] It involves the purchase by the plaintiff of a 53-foot fishing vessel to be constructed by the defendant conforming generally to the plans and specifications of an earlier fishing vessel constructed by the defendant. The vessel's construction has been completed and the defendant is prepared to deliver it to the plaintiff upon the payment of the balance due it by the plaintiff. The plaintiff denied he owed the defendant anything; in fact, he asserted charges in its favor against the defendant by way of an offset and counterclaim. The plaintiff seeks what he denominates a declaratory judgment action for an accounting between the parties, a restraining order against the sale of the vessel by the defendant and, finally, for preliminary affirmative injunctive relief compelling the defendant to deliver immediately the completed vessel with all necessary documentation, warranties, and manuals to him. The plaintiff tendered to the defendant his check for the balance claimed by the defendant to be remaining due on the vessel, subject to a subsequent accounting between the parties. When the plaintiff refused to make an unconditional payment of the balance due, the defendant notified the plaintiff it expected to sell the vessel as permitted under the written contract between the parties. The plaintiff responded by filing this suit. The state court entered an ex parte restraining order against a sale of the vessel by the defendant. When the action was removed, this restraining order was continued by the district court. The plaintiff moved in the district court for a preliminary injunction continuing the restraint on the sale of the vessel by the defendant and for an affirmative mandatory injunction requiring the defendant to turn over the vessel with all necessary documentation to the plaintiff pending the disposition of the dispute between the parties over the amount due the defendant. The district court granted the preliminary injunctive relief sought by the plaintiff. The defendant on appeal challenges that order. We affirm in part, reverse in part, and remand to the district court for further proceedings consistent with the rulings herein.
 
 I.
 
 2
 The defendant, a North Carolina corporation, is a custom boat builder with its boatyard located at Manteo, North Carolina. The plaintiff is a lawyer living in Norfolk, Virginia. On November 16, 1989, the two parties, after some negotiations and following the preparation of a number of drafts, entered into a written contract by which the defendant agreed to construct and sell to the plaintiff a 53-foot fishing vessel. The plans and specifications for the vessel's construction were to be prepared by the defendant and were to "be similar to and based on the design of FANTASTIC, a boat recently constructed by the BUILDER." The base price, as shown on Schedule A, attached to and made a part of the contract, was $246,963.05. The prices of "amenities" to be installed on the vessel, as"based upon Schedule B," were tentatively to be determined by "the costs of equipment as provided on the vessel 'FANTASTIC' and [were to] be adjusted accordingly as costs may vary at the time of the purchase." The contract prohibited any changes in the plans and specifications not agreed to by the parties and, provided that if the changes that might be agreed on resulted in "deletions or reduction" there were to be "reasonable downward charges in the contract price [as] ... agreed by the parties" or, if the changes represented agreed additions, the plaintiff was to be "billed at actual costs of materials plus all labor time spent at the rate of $15.00 per hour (currently $15.00 per hour but subject to increase as the cost of labor increases and only after written notice to BUYER)." Payments were to be made by the plaintiff to the defendant as the work progressed. The amounts of the progress payments were to be determined by materials and labor expended by BUILDER within the 30-day period subsequent to the date of last progress payment. Request for progress payments were to be made no later than the 10th of each month with each request itemizing materials and labor. Payments are to be due and payable to BUILDER within two days after receipt by the BUYER. These payments were subject to an agreement that no more than 90% of the purchase price were to be due from plaintiff prior to launching of the vessel and acceptance by plaintiff. "Upon acceptance [of the vessel] by the BUYER the remaining balance of the purchase price shall be paid to BUILDER." The "Default" section of the contract provided that, should the defendant default, "the BUYER shall have such rights and remedies as are provided for by law but in no event shall be entitled to specific performance or a money judgment greater than the amounts the BUYER has actually paid to the BUILDER."
 
 
 3
 After the execution of the contract, the defendant proceeded with the construction of the vessel. During that time it periodically presented progress payments, properly itemized, to the plaintiff who paid the same with the exception of the last payment due with the completion of the boat. On October 17, 1990, the defendant had notified the plaintiff that it was "ready to allow delivery of the MY BOY IV[2] but you have refused to pay the remaining balance of $28,891.67," and that, in the event payment is not made within 5 days it advised it would exercise its right under the contract to sell the vessel "as Owner." In response to this notice, the plaintiff filed his action "for Declaratory Judgment, Temporary Restraining Order and Injunction."
 
 
 4
 In his complaint, the plaintiff alleged that a dispute had arisen between the parties over the terms of the contract, over plaintiff's claim of defects in the workmanship and over the plaintiff's claim of overpayment. In connection with the last claim, the plaintiff states that the "total cost" to him of the vessel was fixed under the contract at the absolute over-all amount of $394,162.58 but that he had made cash payments of $431,026.59, showing an overpayment by him of $36,864.01. Although the plaintiff had made these overpayments, he averred that the defendant had asserted that he (the plaintiff) was due to pay an additional $28,891.67 and that "he had to pay that sum in order to receive documentation papers for the vessel." The plaintiff contended that he did not owe the defendant $28,891.67, and that the defendant owed him instead, as we have said, $36,864.01 for overpayments. In addition, the plaintiff argued that he was entitled to recovery from the defendant for two other items. One of the items that the plaintiff claimed was due him was the sum of $34,573.74 paid by him for work or equipment used in the construction of the vessel for which the defendant was allegedly responsible but which he (the plaintiff) had paid, and $18,896.29 for improper labor charges claimed by the defendant and again allegedly paid by the plaintiff. The final claim by the plaintiff against the defendant was for alleged "defective work and construction" discovered"upon inspection of the vessel by the plaintiff." Plaintiff declared that he did not "know [what] the costs to correct the defects" would amount to. Although he alleged that the defendant owed him several times the amount claimed against him by the defendant, the plaintiff alleged that he had "deposited the sum of $28,891.67 with the Clerk of Superior Court of Dare County so that he might effect a delivery of his vessel pending resolution of the matter."[3]
 
 
 5
 As a basis for his claim for injunctive relief, the plaintiff identified the harm being suffered by him by the defendant's refusal to deliver the vessel to him to be "loss of use of vessel; loss of opportunity to complete the construction of the interior of the vessel; loss of opportunity to inspect and survey vessel to ascertain damages due to defective workmanship; and loss of opportunity to secure permanent financing and insurance on the vessel at lower rate." On the other hand, he asserted the defendant would suffer no harm by an injunction since if it was found that the plaintiff "were entitled to no offsets or credits as he has alleged, the Defendant would suffer no harm because Plaintiff has deposited the disputed sums with the Clerk of Superior Court of Dare County upon the filing of this action." The plaintiff concluded with a prayer for a Temporary Restraining Order preventing the defendant from selling the vessel "until a hearing may be had on Plaintiff's request for a preliminary injunction" and at the hearing for a mandatory preliminary injunction requiring the defendant to deliver to him the vessel, with all equipment and amenities, all operating manuals, warranties and a "Builder's Certificate so that Plaintiff's vessel can be documented." He also asked that the court "determine the rights, obligations and sums due each of the parties according to the contract" between the parties.
 
 II.
 
 6
 Promptly after filing his action, the plaintiff moved the state court to grant him (1) a temporary restraining order prohibiting the defendant from selling the vessel, and (2) the setting of a hearing on the application for a mandatory preliminary injunction commanding the defendant to deliver to him the vessel with all necessary documentation, warranties and manual. By order dated October 30, 1990, the state court entered an ex parte restraining order prohibiting the sale of the vessel by the defendant and provided for a hearing on affidavits to be held on November 5, 1990 in order to "determine if a preliminary injunction should issue and the plaintiff's vessel delivered to him."[4] The state court justified the grant of the injunction by finding
 
 
 7
 That it appears that the defendant will be protected to the extent he may be damaged by enjoining the sale of the subject vessel pending a hearing to determine whether or not a preliminary injunction should be granted enjoining the sale of vessel pending a resolution of this matter on the merits by the deposit of $28,891.67 with the clerk of court.
 
 
 8
 Before the state court could hold a hearing on plaintiff's motion for injunctive relief, the defendant removed the action to the federal court. The district court continued the restraining order of the state court until there could be a hearing on the motion for a preliminary injunction. The district court at the same time fixed a time for the hearing on plaintiff's motion for the mandatory injunctive remedy.
 
 
 9
 Awaiting the hearing on plaintiff's motion for preliminary injunctive relief, the parties filed, as contemplated by the court's order, affidavits. Irma Forbes, the secretary-treasurer of the defendant, executed her affidavit on behalf of the defendant on November 15, 1990. She emphasized at the beginning of the affidavit that the contract between the parties had gone through "at least seven" redrafts. She discussed a number of provisions of the contract. She pointed out that the FANTASTIC, built and sold by the defendant for another customer, was constructed in 1988 and the vessel contracted for by the plaintiff was to conform generally to the plans and specifications of the FANTASTIC. She said that in order to provide some estimate of the cost of the "amenities" (Schedule B) to be installed, the parties set forth in Schedule B the prices paid or charged for the like amenities on the FANTASTIC. Both parties, the affiant declares, recognized that the prices in Schedule B "were estimates only and that the price would be adjusted according to any increase in costs." The affidavit proffered as illustrative of changes in the price of the amenities between 1988 and 1990 one article whose price had increased between 1988 and 1990. She also identified a number of changes in the amenities requested by the plaintiff which increased the costs and for which an adjustment in the price occurred. Moreover, she stated in her affidavit when the plaintiff raised some objection to a price charged in connection with the purchase of certain "amenities" that the defendant had offered to make its books, invoices and records of payment available to any accountant of plaintiff's selection to verify the accuracy of its charges. The plaintiff never availed himself of this opportunity but he did pay every billing except the last. She stated that the base price under the contract (Schedule A) was $246,963.05 and the cost of the amenities so far were $213,309.52, thereby establishing the total cost due to have been paid by the plaintiff was $460,272.57. The actual amount paid by plaintiff, however, was $431,373.09, leaving a balance due the defendant by the plaintiff of $28,899.48.
 
 
 10
 In his contra affidavit, the plaintiff asserted that"the contract [between the parties] provided that the vessel was to be constructed for the sum of $394,162.58." This figure represented the fixed price for services under Schedule A and the estimated costs of the amenities in 1988 when the "FANTASTIC" was being built ($147,199.53). This calculation disregards the contract's statement that the prices set forth in Schedule B should be adjusted to take account of changes occurring at time of purchase in 1990 subsequent to the construction of FANTASTIC and the provision in Section 3.3 of the contract that "[a]dditions shall be billed at actual cost of materials plus all labor time spent at the rate of $15.00 per hour." The plaintiff also indicated in his affidavit his intimate relationship with all phases of the vessel's construction. According to his affidavit, he had"been directly involved in the construction and design of the vessel, and many of the items and methods of construction were selected for my personal tastes based upon my years of fishing and boating experience and that I have expended great amounts of my time, energy and personal involvement in the construction of this vessel which is very personal to me and in which I have invested a great deal of emotional involvement and attachment." He added that he had "made numerous trips to Dare County to supervise the construction of the subject vessel; to make decisions concerning the installation of equipment, engines, generators and other components of the subject vessel, and to resolve problems arising in the construction of the subject vessel."
 
 
 11
 There were other affidavits filed, primarily by the parties, with at best marginal concern here. The plaintiff complained that he was unable to insure the vessel because he lacked possession. The defendant responded that he had the vessel insured for $500,000. Another affidavit stated that without the documentation of the vessel, the plaintiff was unable to give a lien on the vessel to secure a loan from the bank. Of course, plaintiff could not give a bank a lien until he had acquired possession of the vessel. The two affidavits of the plaintiff and the secretary-treasurer of the defendant, however, are not of any real significance in this controversy.
 
 III.
 
 12
 After the hearing on November 16 of plaintiff's motion for both injunctive relief against a sale of the vessel before trial in order to maintain the status quo and a mandatory preliminary injunction transferring the vessel before trial to him, the district court filed its order. In it the court said in conclusory terms that it found "that the plaintiff has made a threshold showing of irreparable harm, a likelihood of prevailing on the merits, that there is an inadequate remedy at law, and that the relief granted will not unduly harm the defendant at this time." It supported this conclusory finding with no reasoned explanation of the conclusion. It proceeded to grant a preliminary injunction against the defendant "selling the vessel and retained jurisdiction over this preliminary injunction for the entry of further orders consistent with the findings and conclusions that will result from the hearing on November 16, 1990." The district court on December 3, 1990 entered its order on plaintiff's motion for preliminary injunctive relief.
 
 
 13
 The court stated in the decree of December 3, that its order "supplements the orders entered November 16 and 26, 1990,[5] which enjoined defendant from selling the subject vessel" and then repeated its finding in its November 16 order "that plaintiff has made a threshold showing of irreparable harm, a likelihood of prevailing on the merits, that there is an inadequate remedy at law, and that the relief granted will not unduly harm the defendant at this time." Again it offered no supporting details for these conclusory findings. The Court did refer to the affidavits of the parties, stating simply that the plaintiff's affidavit showed the "need for the transfer of the boat and accompanying documentation," again without any supporting details, and to the defendant's affidavit that the plaintiff still owed $28,891.67 under the construction contract. With this bare statement, the district court proceeded to decree "that plaintiff may obtain possession and title to the subject vessel, equipment, and amenities, as well as all operating manuals, warranties and other documents relating to the equipment installed on the vessel as well as Builder's Certification, by tendering the sum of $28,891.67 to defendant," giving the defendant two days within which to comply after tender to the defendant by the plaintiff. The district court concluded its decree with the statement that, "This order in no way affects the resolution of the merits, but rather allocates possession of the disputed items prior to trial."
 
 
 14
 The defendant petitioned the district court for reconsideration of the December 3 order. It referred to the provisions of the contract between the parties giving the respective parties their remedies on default. It asserted the plaintiff had been in default for three months and requested its right under the contract in such event to sell the boat. It states the boat had been appraised at $650,000 and the defendant is therefore assured that, if given a reasonable opportunity to sell, it could secure a purchase price allowing the defendant to reimburse the plaintiff fully for everything he has paid and expended independently on the vessel. Defendant further argues this is fair since the plaintiff claims the boat is defective. The defendant agreed that if it were not able to sell the boat for enough to reimburse the plaintiff fully for his investment in the vessel, it would turn the vessel over to the plaintiff. By order dated December 10, the district court denied the motion, providing that if the defendant appealed herein, it must either turn the vessel over or post bond in the sum of $459,848.26[6] with the Clerk of Court by December 14, 1990. The defendant appealed and, in that connection, asked this court to stay the decree of December 3 pending disposition of the appeal. We granted the stay and the cause is now before this court for decision.
 
 
 15
 We begin our review by stating the applicable legal principles to be applied to the facts in the case.
 
 IV.
 
 16
 It has long been accepted that "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974). With particular reference to preliminary injunctive relief, such relief is regarded as an "extraordinary" and "drastic" use of the court's injunctive power and is never to be granted lightly, but instead is to be used only in the limited circumstances which clearly demand it. Instant Air Freight Co. v. C.F. Air Freight, Inc., 721 F.2d 1121, 1123 (7th Cir. 1983); Morgan v. Flether, 518 F.2d 236, 239 (5th Cir. 1975).[7] Moreover, the courts have made a distinction in treatment between a motion for preliminary injunctive relief to maintain the status quo and one to provide mandatory relief, especially relief which in effect operates as deciding the case in favor of the movant. We emphasized this distinction between the two types of preliminary injunctive relief in Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980), stating,
 
 
 17
 The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.
 
 
 18
 Our view in Wetzel, 635 F.2d at 286, conforms to the views of other circuits. In Doe v. New York Univ. 666 F.2d 761, 773 (2d Cir. 1981), the Second Circuit stated,
 
 
 19
 Where, as here, mandatory relief is sought, as distinguished from maintenance of the status quo, a strong showing of irreparable injury must be made, since relief changing the status quo is not favored unless the facts and law clearly support the moving party.
 
 
 20
 In SCFC ILC, Inc. v. VISA USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991), the Tenth Circuit stated,
 
 
 21
 In addition, the following types of preliminary injunctions are disfavored and they require that the movant satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may be issued: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.
 
 
 22
 ....
 
 
 23
 See, e.g., GTE Corp., 731 F.2d at 679 ("The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits."); Citizens Concerned for the Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1299 (10th Cir. 1980), cert. denied, 452 U.S. 963, 101 S. Ct. 3114, 69 L. Ed.2d 975 (1981) (requiring a showing of compelling circumstances to justify the imposition of preliminary injunctive relief that was mandatory and which disturbed the status quo); Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1980) (noting that because a preliminary injunction that alters the status quo is"particularly disfavored" the movant must make a strong showing of entitlement).
 
 
 24
 Under these authorities, in cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, as here, the two requests must be reviewed separately, with the request for mandatory relief being subjected to a more exacting standard of review.
 
 
 25
 The courts have developed a fairly specific standard to be employed in reviewing applications for preliminary injunctive relief whether for maintenance of the status quo or for mandatory relief. Under those standards, the four factors to be considered in determining whether to grant the relief are, as this court stated in Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991):
 
 
 26
 (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
 
 
 27
 (2) the likelihood of harm to the defendant if the requested relief is granted,
 
 
 28
 (3) the likelihood that the plaintiff will succeed on the merits, and
 
 
 29
 (4) the public interest.
 
 
 30
 The movant has the burden of establishing that each of these factors supports the grant of the injunction, Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136, 1139 (7th Cir. 1984), and the district judge "is required to make specific findings concerning each of the four factors" in his decision, International Longshoremen's Ass'n., Local 1937 v. Norfolk Southern Corp., 927 F.2d 900, 903 (6th Cir.), cert. denied, 112 S. Ct. 63 (1991), findings which are "the product of reasoned application of the four factors held to be necessary prerequisites" to the grant of preliminary relief." Enterprise Int'l, Inc. v. Corporacion Estatal Petroleva Ecuatoriana, 762 F.2d 464, 472 (5th Cir. 1985).
 
 
 31
 To properly execute the "flexible interplay" given these factors, courts have developed two methods of analysis-one characterized as the "traditional," and the other, as the "hardship balance test," or "alternative test," for the grant of preliminary injunctive relief. American Motorcyclist Ass'n. v. Watt, 714 F.2d 962, 965 (9th Cir. 1983). However, these standards or tests "are not two separate tests, but rather, merely extremes 'of a single continuum,' " Colorado River Indian Tribes v. Town of Parker, 776 F.2d 846, 849 (9th Cir. 1985) (quoting Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1201 (9th Cir. 1980)), to be used in determining whether the preliminary relief is to be granted.
 
 
 32
 Under the traditional procedure, the Court begins its determination by considering first the likelihood of success on the merits and "[i]f the likelihood of success [on the merits] is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction." North Carolina State Ports Authority v. Dart Containerline Co., 592 F.2d 749, 750 (4th Cir. 1979).[8] Under the "balance-of-hardship test," applied in this circuit, the first step is to balance the irreparable harm to the plaintiff if injunctive relief is denied against the harm to the defendant if injunctive relief is granted. Should this balance not tilt decidedly in plaintiff's favor, the need for showing probable likelihood of success on the merits increases and becomes more important in the evaluation, whereas, if the balance tilts decidedly in the plaintiff's favor, the requirement of a showing of success on the merits diminishes and may be satisfied " 'if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation.' " Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 195 (4th Cir. 1977) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953)).[9]
 
 
 33
 Since "irreparable harm" is critical under either the traditional or alternative standard for considering a motion for preliminary injunctive relief, Morton v. Beyer, 822 F.2d 364, 371 (3d Cir. 1987); Holt v. The Continental Group, Inc., 708 F.2d 87, 90 (2d Cir. 1983), cert. denied, 465 U.S. 1030 (1983); EEOC v. City of Janesville, 630 F.2d 1254, 1259 (7th Cir. 1980), it is well to define this term. A claim or injury is not "irreparable" if there is an adequate remedy at law for such claim or injury. Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984). Moreover, "an 'injury or claim is "irreparable" only if it cannot be undone through monetary remedies.' " Enterprise Int'l, Inc. v. Corporacion Estatal Petroleva Ecuatoriana, 762 F.2d 464, 472 (5th Cir. 1985) (quoting Deerfield Medical Ctr. v. City of Deerfield, 661 F.2d 328, 338 (5th Cir. 1981)). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to meet the standard of "irreparable." Virginia Petroleum Jobbers Ass'n v. Federal Power Comm., 259 F.2d 921, 925 (D.C. Cir. 1958), quoted in Sampson v. Murray, 415 U.S. 61, 92 (1974). In addition, the harm, to qualify as "irreparable," must be"neither remote nor speculative but actual and imminent," Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989), and must represent an immediate threat of irreparable harm, Dan River, Inc. v. Icahn, 701 F.2d 278, 283 (4th Cir. 1983).
 
 
 34
 "Likelihood of success," the second factor considered in the balancing process, has been deemed to require a showing "clear and convincing on the part of the plaintiff." Mycalex Corp. of America v. Pemco Corp., 159 F.2d 907, 912 (4th Cir. 1947). One treatise puts the standard by which "likelihood of success" on the merits must be established when the hardship balance does not tip decidedly in favor of the plaintiff as a probability (not mere possibility) of success of the ultimate trial on the merits. "Probability of success" implies that the plaintiff must have a very clear and strong case. Some courts have stated this in terms by the maxim that in considering preliminary injunctive relief "to doubt is to deny." That is, if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.
 
 
 35
 2 J. Thomas McCarthy Trademarks and Unfair Competition, § 30:16 at 485-86 (2d ed. 1984). Unless the movant for preliminary injunctive relief can meet the requirements of this "interplay" between the two factors of "irreparable harm" and "likelihood of success," the grant of preliminary injunctive relief is not defensible.
 
 
 36
 The Fourth Circuit articulated the standard for review on appeal of a grant of injunctive relief in Blackwelder Furniture Co. v. Seilig Mfg. Co., declaring,
 
 
 37
 When the grant or denial of interim injunctive relief is reviewed, it is simplistic to say or imply, as we sometimes do, that it will be set aside only if an abuse of discretion can be shown. For there is, of course, the possibility that the court below has either failed to exercise its discretion in some respect or else exercised it counter to established equitable principles. A judge's discretion is not boundless and must be exercised within the applicable rules of law or equity. And our review of the lower court's application of the law is not limited by the same "clearly erroneous" rule which restricts our review of its findings of fact under Rule 52(a).
 
 
 38
 550 F.2d at 193 (citations omitted). In Roland, 389-90, the Seventh Circuit, quoting extensively from other authorities, echoed the rule that Judge Craven expressed in Blackwelder, 550 F.2d at 193:
 
 
 39
 "[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." The exercise of a power so farreaching ought to be subject to effective, and not merely perfunctory, appellate review. "Congress would scarcely have made orders granting or refusing temporary injunctions an exception to the general requirement of finality ... if it intended appellate courts to be mere rubber-stamps save for the rare cases when a district judge has misunderstood the law or transcended the bounds of reason."
 
 
 40
 These considerations may explain why, as we pointed out earlier, many cases that recite "abuse of discretion" as the standard of review actually review the district judge's order granting or denying a preliminary injunction as if the standard were clear error (both for pure factfindings and for the district judge's application to those findings of the principles for granting or denying preliminary injunctions) or mere error (for pure legal determinations). In these cases, the words "abuse of discretion" are not being used literally, to refer only to cases where the ruling being reviewed is a discretionary one. It seems, therefore, that the words describe a range of standards in which the amount of deference given the trial judge's rulings varies with the nature of the ruling-a range that overlaps clear error, and even error, period.
 
 
 41
 749 F.2d at 389-390 (citations omitted).
 
 
 42
 The discretionary rule for appellate review is thus more relaxed in the context of a preliminary mandatory injunction request. We now apply that principle to the facts of this case.
 
 V.
 
 43
 At the outset, we must consider whether the plaintiff has, by the contract on which his rights rest, in clear and unambiguous language foreclosed the transfer of possession of the vessel from the defendant to the plaintiff. In that connection, it seems incontestable that the contract between the parties in this case fixes the rights of the parties. It is the contract which the plaintiff participated in drafting and which he had accepted, as evidenced by his signature. In essence, plaintiff is seeking the equitable remedy of specific performance of the agreement to construct and deliver a vessel conforming to the plans and specifications provided in the parties' contract. Yet, that is a form of relief which the contracting parties-the plaintiff and the defendant-agreed explicitly in the contract would not be available to the plaintiff in the event of default by the defendant of any of its obligations and duties under the contract. In the Remedy Section of the contract the parties expressly agreed:
 
 
 44
 In the event BUILDER defaults in the performance of its responsibilities and obligations under this AGREEMENT the BUYER shall have such rights and remedies as are provided for by law but in no event shall be entitled to specific performance or a money judgment greater than the amounts BUYER has actually paid to BUILDER.
 
 
 45
 The plaintiff by this provision unequivocally restricted himself, in event of default in performance under the contract, to remedy at law and waived a right to seek the equitable remedy of specific performance. Despite plaintiff's attempt to disguise his suit as one for a declaratory judgment-at least so far as his motion for a mandatory injunction is concerned-his plea for a temporary injunction is one for preliminary specific performance.
 
 
 46
 Strangely enough, neither the plaintiff nor the district court gave any consideration to the "Default" Section of the contract in either argument or opinion, despite defendant's repeated effort throughout all the hearings before the district court to press the argument. In that section, the plaintiff expressly waived any right to a specific performance of the contract. Furthermore, the plaintiff has not addressed the point in this Court. Apparently both the plaintiff and the district court regarded the contractual provision proscribing specific performance as a nullity to be dismissed without a comment. This, however, was contrary to the laws of North Carolina, the controlling forum since the contract herein was executed and to be performed in North Carolina.
 
 
 47
 Under the North Carolina Commercial Code, the parties to a contract have complete freedom to fashion their own remedies for default. See N.C. Gen. Stat. § 25-2-719(1)(a) Official Comment (1986); Billings v. Joseph Harris Co., Inc., 226 S.E.2d 321, 325 (1976). The North Carolina courts have extended this statutory rule to sales which may not qualify under the Uniform Commercial Code, since the laws governing sales are similar in each case. Richard W. Cooper Agency, Inc. v. Irwin Yacht & Marine Corp., 264 S.E.2d 768, 771 (N.C. Ct. App. 1980). The only exception to this rule is the situation where the restriction under all the circumstances may be said to be unconscionable or unreasonable. And the provision is unconscionable or unreasonable if the contract fails to "provide 'minimum adequate remedies.' " Stan D. Bowles Distrib. Co. v. Pabst Brewing Co., 317 S.E.2d 684, 690 (N.C. Ct. App. 1984) (citations omitted). As the Court observed in Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp., 304 S.E.2d 773, 776 (N.C. Ct. App. 1983),"it is rare that a limitation of remedy will be held unconscionable in a commercial setting since the relationship between business parties is usually not so one-sided as to force an unconscionable limitation on a party." That language is particularly apt in this case. The plaintiff is a welleducated, experienced and successful lawyer who is unquestionably able to protect himself in a contract involving his own interests. He voluntarily and knowingly waived any right to specific performance, whether preliminary or otherwise, and limited his remedy to actions at law. He cannot escape the effect of such a voluntary act.
 
 
 48
 The contract, it seems to us, should have disposed of the motion herein. It is also clear that, under established federal procedure, the motion should have been dismissed on the facts presented to the district court in support of the motion.
 
 VI.
 
 49
 The plaintiff seemingly recognized the weakness of his showing. All his claims could be satisfied by a monetary award in an action at law and thereby failed to qualify for injunctive relief under established precedents. See Roland Machinery Co., 749 F.2d at 386. He offered in his complaint an identification of the"irreparable harm" he was to suffer if denied the temporary injunction:"loss of use of vessel; loss of opportunity to complete the construction of the interior of the vessel; loss of opportunity to inspect and survey vessel to ascertain damages due to defective workmanship; and loss of opportunity to secure permanent financing and insurance on the vessel at lower rates." In his affidavit filed in support of the motion for temporary injunction, the plaintiff enlarged somewhat on his allegation of "irreparable harm." He contends he is being "denied access to my boat to use it for personal pleasure and entertaining clients or friends." He further contends he is being denied the opportunity to secure owner's insurance, which would be lower than insurance while the vessel is being completed, or to inspect his "vessel for defects in the workmanship."[10]
 
 
 50
 Yet, it is plain that the plaintiff did not meet the prerequisite of "irreparable harm" as that term is used in this context. The vessel, according to the affidavit of Irma Forbes, is presently insured under a policy procured in an amount sufficient to satisfy the claims of the parties, if sustained. The claim of the plaintiff of use of the boat and opportunity to entertain on the vessel will not constitute the required "irreparable harm." Sampson v. Murray, 415 U.S. at 92.
 
 
 51
 The district court's opinion granting the injunction is sparse on details and offers no explanation of its factual findings and legal conclusions. Further, it takes no note of the extraordinary character of a preliminary injunction or of the strong showing that the plaintiff must make in order to qualify for a preliminary injunction. Even more significant is its failure to recognize that the plaintiff's primary request is for an affirmative preliminary injunction ordering the transfer of possession of the subject of the action (the vessel) from the defendant to the plaintiff, a form of relief that is disfavored in the law and that requires a more compelling showing than that required for the maintenance of the status quo. The opinion of the district court does apply the four factors which we have declared in a long line of cases are to be used in determining whether a preliminary injunction is warranted. But it does so in purely conclusory terms. For example, it does not consider whether the evidence "tilted decidedly" in plaintiff's favor, which is the first circumstance to be considered under the hardship test. It does not identify what irreparable harm plaintiff was reasonably likely to suffer absent preliminary relief, even though this is the first fact to be established under the Rum Creek formula. On appeal, this court is forced to speculate as to the basis of this finding, without the benefit of any guidance from the district court on what constituted the irreparable harm to which the plaintiff was exposed and whether the plaintiff has proved such harm by the appropriate standard of "clear and convincing." Similarly, the district court made the conclusory finding that the plaintiff had established that he would likely prevail at trial on the merits. Again, it fails to give any reasoned explanation for its finding, and as we said in Rum Creek, these two factors (irreparable harm and likelihood of success on the merits) are the most important factors to be established. But, in the absence of any reasoned explanation for the court's finding, and any identification of facts in the record "tilting decidedly" in plaintiff's favor, this court has no means of intelligently reviewing the lower court's decision on these primary prerequisites for a preliminary injunction. These omissions would be sufficient to mandate the remand of this proceeding to the district court for additional findings. However, the record was sufficient to make it reasonably certain that the findings of irreparable harm and likelihood of success on the merits, as made by the district court, could not be sustained. We shall briefly state the reasons for this conclusion by us.
 
 
 52
 The contest between the parties concerned the right to immediate possession of the vessel pending trial-a question dependent upon whether the plaintiff had paid the amount due the defendant for the vessel. The defendant presented the plaintiff with its final itemized statement of charges, totaling $28,891.67. The plaintiff does not appear to have disputed any of the items in these charges and conceded that the amounts stated therein were due. It defended by alleging its rights of offset and of counterclaim against the defendant in excess of the amount due on this final bill, arising out of matters prior to the filing of the defendant's final bill. The rights of offset and counterclaim as asserted by the plaintiff consisted of three claims, which are claims for monetary awards. The first of these claims was for alleged overpayment of the monthly progress bills ($36,864.01), the second for materials and labor charged but not furnished ($34,573.74), and the final claim of an unstated amount for defective workmanship. All three claims are redressable by a monetary judgment in a proceeding at law. As such, they could not qualify as "irreparable harm" in the context of a request for a preliminary injunction. See Roland Machinery, 749 F.2d 380.
 
 
 53
 The plaintiff did allege some supplementary allegations relating to irreparable harm. He claimed deprivation of use of the vessel for his enjoyment and as a means of entertaining his friends and clients, as well as an "emotional attachment" to the vessel. Neither of these claims could qualify as "irreparable harm." Until it should be resolved that he had fully paid for the vessel in accordance with the terms of the contract, and the terms of the contract had been resolved in the determination of his offset and counterclaim rights, the plaintiff was not entitled to the possession and enjoyment of the vessel. The plaintiff's claim that he was denied the right to insure the vessel is answered by the defendant's response that he has the vessel insured in an amount more than necessary to repay the plaintiff if his rights are sustained at trial. As we have already observed, the allegation that he has not been allowed to inspect the vessel in order to discuss possible defects of workmanship is refuted by plaintiff's own allegations. In response to his charge that he cannot secure financing from a bank because he lacks title to the vessel, he can easily secure this by paying unconditionally the balance due. To summarize, there simply was no showing of "irreparable harm" as a warrant for a grant of preliminary injunctive relief.[11] Equally absent in the findings of the district court is a basis for its finding of likelihood of success on the merits in favor of the plaintiff. The plaintiff's claim of overpayment seems to be premised on his contention that the prices set forth in Schedule B, titled "Amenities," were fixed and absolute prices. The contract at the very outset declares in clear and unmistakable language that the prices on that Schedule were not fixed prices; they were the prices paid for the materials when the vessel FANTASTIC was built a year or more before. And the contract states unmistakably that these prices would vary as the prices may have appreciated since that date. Further, the defendant provided the plaintiff each month a progress statement of all material purchased and used in such matter. If the price for "Amenities" as included in that progress statement was incorrect, the plaintiff had an opportunity to object and to refuse to pay. The plaintiff, however, paid these invoices; he is not in a position to take issue with these charges at this late date. Moreover, his assertion that he was charged for materials and labor not furnished is equally open to question. In his affidavit filed in support of his motion, the plaintiff said he had been intimately involved in all phases of the construction of the vessel and had been constantly visiting the vessel and following the work as it progressed. He was receiving monthly itemized invoices. It would seem reasonable to assume that he would have detected any spurious charges. In addition, the defendant offered to make available all its records to any certified public accountant selected by the plaintiff so that the plaintiff could satisfy himself that all charges made to the plaintiff were proper. Finally, if the workmanship was so defective as the plaintiff contends without specification, he could have refused to take delivery of the vessel. That is the normal remedy. The plaintiff's demand for immediate possession suggests that the vessel met all the specifications. Moreover, the plaintiff did not seek to contradict that the finished vessel had been appraised as worth $650,000, some $150,000 more than plaintiff was paying for the vessel. It is thus easy to understand why the plaintiff did not want the vessel sold with the proceeds used to repay him. Certainly, the plaintiff would not have wanted possession so much if he had thought the vessel was faultily constructed.
 
 
 54
 We have discussed at some length the various aspects of plaintiff's claims and particularly his showing of the primary factors (irreparable harm and likelihood of success) which a party seeking temporary injunctive relief must meet. Our review of the present record, partially outlined above, demonstrates that the plaintiff has never met its burden of establishing either of these basic prerequisites for a grant of preliminary injunctive relief. It is true the district court declared that it found that both factors were satisfied by the proper standard of proof. But this was a conclusory finding. No specific factual findings were brought forward to support that conclusory statement. The authorities are clear, as our review abundantly establishes, that this is not enough. See International Longshoremen's Association v. Norfolk Southern Corp., 927 F.2d 900. The orders of the district court simply are not adequately backed by specific findings and cannot be sustained.[12] The order of the district court granting a preliminary injunction to prohibit sale of the vessel to a third party prior to adjudication of claims herein is affirmed, but the mandatory injunction requiring the defendant to turn possession of the vessel over to the plaintiff is reversed. The cause itself is remanded to the district court for trial and disposition not inconsistent with this decision.
 
 
 55
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The plaintiff is a resident of Virginia and the defendant is a Virginia corporation with its headquarters and operations in North Carolina
 
 
 [2]
 This was the name given the boat being constructed
 
 
 [3]
 Inquiry indicated that this deposit was never made-at least, no deposit was ever transferred to the Clerk of the district court after the removal of the action
 
 
 [4]
 This order was prepared by the plaintiff's counsel, though the court made certain additions to the order
 
 
 [5]
 The November 26 order continued the restraining order of November 16 "establishing a status quo with respect to the possession of the vessel."
 
 
 [6]
 The district court has not given the basis for this figure of $459,848.26
 
 
 [7]
 This characterization of the extraordinary nature of the preliminary injunction and the limitations in its application are the prevalent rule in the local forum where this case arose. Investors, Inc. v. Berry, 295 S.E.2d 566, 574 (N.C. 1977)
 
 
 [8]
 While the Court in North Carolina State Ports Authority employed the balance-of-hardship test, the opinion provides an accurate statement of the method for applying the "traditional" test. North Carolina State Ports Authority, 592 F.2d 749, 750 (4th Cir. 1979)
 
 
 [9]
 Under this procedure, the required showing of probability of success "varies with the quality and quantum of harm that[the moving party] will suffer from the denial of an injunction." District 50, UMW v. International Union, UMW, 412 F.2d 165, 168 (D.C. Cir. 1969). Another articulation of this procedure appears in Kowalski v. Chicago Tribune Co.: "A request for preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harms inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." Kowalski v. Chicago Tribune Co., 854 F.2d 168, 170 (7th Cir. 1988)
 
 
 [10]
 The defendant responded to some of these statements by averring that it had ample insurance to protect both itself and the plaintiff, an averment not contradicted by the plaintiff. Clearly, the plaintiff could not insure the vessel until he had title, and he could not secure title until the parties had resolved their differences as to whether defendant had been paid. The assertion regarding inspection opportunity is contradicted by the allegations of the plaintiff in paragraph 20 of his complaint that"upon inspection of the vessel by the Plaintiff, Plaintiff discovered defective work and construction of the subject vessel as follows," giving nine specific defects he had found as a consequence of his inspection
 
 
 [11]
 The district court, stating that it was seeking to maintain the status quo, sought to solve the ultimate issue of entitlement to the boat by providing that the plaintiff should tender payment to the defendant of the amount claimed due, but retaining jurisdiction of the case to determine whether that claim of the defendant should be offset by the three claims of the plaintiff (with a judgment over against the defendant for any overage of plaintiff's claims after offsetting against the amount due the defendant by plaintiff). The district court provided that discovery and a trial on the plaintiff's claims against the defendant should proceed and would not be delayed if the defendant appealed its order. In short, the payment by plaintiff as required under the court's order was not an absolute, unconditional payment but a payment subject to repayment by the defendant if the plaintiff was able to sustain his offset and counterclaims. The defendant naturally refused such conditional payment. Moreover, by requiring the conditional payment, the district court purported to transfer possession of the vessel from the defendant to the plaintiff with authority to the plaintiff for the immediate use and enjoyment of the vessel. Such an order was plainly not one to maintain the status quo but one to effect a transfer of possession, thereby giving the plaintiff the fruits of victory before he had established his right to victory
 
 
 [12]
 It is possible the able district judge may have thought that, since he was requiring the plaintiff to tender the disputed balance due on the vessel to the defendant, the defendant could not object to turning the vessel over to the plaintiff. But the tender was not absolute; it was only conditional. The court's order declares unequivocally that its order of December 3 in no way affects the resolution of the merits, but rather "alleviates possession of the disputed items (sic) pending trial," and in its order of December 10, denying rehearing of that order, it said that the "scheduling of discovery and trial proceedings shall proceed notwithstanding appeal of the court's December 3 order." The tender settled nothing. Whether the defendant was entitled to the money would only be settled when the case had been tried on its merits. The tender merely provided possible security in case the defendant should be successful in defending all the claims asserted by the plaintiff